**Daniel J. BOWLES, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 21948.**

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc Nov. 24, 1969.

Decided Nov. 20, 1970.

Bazelon, Chief Judge, and J. Skelly Wright, Circuit Judge, dissented and each filed opinion.

---

Mr. Isaac N. Groner, Washington, D. C., with whom Mr. David Epstein, Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Mr. Philip L. Kellogg, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Roger E. Zuckerman, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges, sitting *en banc.*

On Hearing En Banc

LEVENTHAL, Circuit Judge:

This is an appeal from a judgment entered on convictions of murder in the first degree (homicide while attempting to perpetrate a robbery) and of assault with intent to rob. The principal questions presented for decision are: (1) whether there was sufficient evidence to

support the jury's verdicts; (2) whether a knife seized from the person of appellant should have been suppressed as the fruit of an illegal, warrantless arrest; (3) whether appellant should have been permitted to call a witness who had indicated that he would claim his Fifth Amendment privilege against self-incrimination. We affirm.

## I. *The Sufficiency of the Evidence*

Detective Wilson of the Metropolitan Police testified for the Government that in the early hours of the morning of March 14, 1967, responding to a call, he discovered in an alley in the rear of 1423 R Street, N. W., the deceased, Donald W. Ingham, lying face down with blood coming from his mouth and nose. One of the deceased's pants pockets was turned inside out and torn. On the ground near the body were a billfold belonging to the deceased, scattered change, and the keys to deceased's car, parked several blocks away. There was also a wrist identification type bracelet which belonged to the deceased who, it developed, was a serviceman, although clad at this time in dark civilian clothes.

Ingham was pronounced dead on arrival at the hospital at 3:50 a. m. The doctor who performed the autopsy testified that the cause of death was a knife wound in the chest, a wound that could have been inflicted with a hard blow of the knife found on appellant at the time of his arrest.

The chief evidence for the Government, however, was the testimony of Mary Burwell, with whom appellant's mother lived. She said that between 8 and 9 p. m., March 14, appellant came to the apartment, sat on the bed beside his mother, asked whether her nerves were all right, and said he had something to tell her, that he had killed a man, a sol-dier, in the back of an alley on R Street. She stated that appellant showed them a knife while he was telling them about the event. She was asked if appellant had said why he killed the soldier. She answered, "No, he said he don't like for anyone to put their hands in his face." Other Government testimony established that there were no other killings involving servicemen on March 13 or 14; and that the two other alley killings that weekend were remote in either time or place, and both had been solved.

Although the question is close, we think this evidence was sufficient to place all the charged counts before the jury. Appellant's confession to his mother in the presence of Mary Burwell, together with the circumstances that no other killings of this type had occurred in the vicinity during the time in question, provides a basis from which the jury could conclude that it was appellant who stabbed the deceased.

A more difficult issue, though, is the sufficiency of the proof that when appellant assaulted the deceased he did so with the intent to rob thereby making the killing a felony murder. Sometimes an intent to rob can be inferred from little more than the assault itself.[1] Here, however, we have no witness to the assault, and the circumstances of a nighttime fight in an alley with a soldier in civilian clothes are consistent with purposes other than robbery. What provides a legally sufficient foundation for the jury's finding of an intent to rob is that coupled with the assault there was evidence—the pocket ripped and turned inside out, the billfold discarded nearby, the change scattered about—that the deceased was robbed. This evidence concerning the appearance of the scene after the assault is probative of attempted robbery and sufficiently narrows the ambiguity residing in the mere fact of assault.[2]

1. Accardo v. United States, 102 U.S.App. D.C. 4, 249 F.2d 519 (1957), cert. denied, 356 U.S. 943, 78 S.Ct. 787, 2 L.Ed.2d 817 (1958); Bullock v. United States, (No. 22,480, March 17, 1970).

2. Even so this evidence of the appearance of the scene is not as probative on the issue of intent as the earmarks of a plan to rob, manifesting themselves prior to the assault, on which we relied in Har-

Counsel argues that someone not involved in the stabbing may have gone through the pockets of the deceased sometime after the killing and before the body was discovered. That is a possibility,[3] but we are unable to say that it is a possibility that required the jury to entertain a reasonable doubt as to defendant's purpose. We think the prosecution evidence was sufficient to avoid a verdict directed for defendant at the end of the prosecution's case.

With a starting point, established by plainly adequate evidence, that defendant killed the deceased, the other facts suffice as circumstantial evidence to warrant an inference of the intent of robbery, subject to being negatived by some other explanation by the defendant. He did not provide such explanation, but instead offered defenses which the jury disbelieved: a defense of alibi, coupled with the claim that he had been joking when he told his mother of the killing, and that he had been told by one Raymond Smith that Smith had committed the killing.

We cannot say that on this record that the jury which was morally convinced of his intent to rob must be charged with abdicating reason.

II. *Validity of Arrest and Seizure of Weapon*

This case was set down for argument en banc together with Dorman v. United States, decided April 15, 1970,[4] because it too raised the issue of the validity of a warrantless arrest. As with *Dorman*, we remanded to the District Court for further elaboration of the circumstances surrounding the arrest and analysis of the legal issues involved. We have reviewed the findings of fact and conclusions of law filed by the District Court and conclude that they adequately support the court's overall conclusion that the arrest of appellant and seizure of a

knife found after a search of his person was valid.

The following situation appears from the trial transcript and remand findings:

By noon of Saturday, March 18, 1967, the police had obtained written statements from appellant's mother and Mrs. Burwell recounting his confession to the killing of a soldier on March 14. These statements included the information that appellant had told his mother and Mrs. Burwell that he was going to kill again before being taken into custody. But although the police had learned from appellant's mother and Mrs. Burwell that appellant often came to Mrs. Burwell's house at 7:00 o'clock on Sunday evenings to see a particular television program, they had no indication of where he might be found prior to that time, except a general indication as to the area of the city which appellant frequented. Consequently initial efforts at apprehension were limited to patrolling the streets in this area, and maintaining a stakeout at Mrs. Burwell's apartment. At around 7:00 p. m., Sunday, March 19, appellant was seen entering Mrs. Burwell's apartment, and immediately thereafter the police went to the apartment and made the arrest.

Appellant was arrested within five feet of the front door after a peaceful entry by the police. He was immediately taken out onto the stairwell landing where he was searched and the knife recovered. No search of Mrs. Burwell's apartment was undertaken. The apartment was the home of Mrs. Burwell and appellant's mother, but appellant did not reside there.

The District Court's view that the warrantless arrest of appellant was valid was based first on the finding that the entry of the police into the apartment was consented, and second on the conclu-

rison v. United States, 128 U.S.App.D.C. 245, 387 F.2d 203 (1967).

**3.** It is also possible that appellant formed the intent to rob after killing the deceased.

**4.** 140 U.S.App.D.C. 313, 435 F.2d 385 (1970).

sion that because the entry was consented and because appellant was immediately led out of the apartment without a search of the premises, the actual seizure of appellant stands on the same footing as an arrest in a public place for which a warrant is not required. Rouse v. United States, 123 U.S.App.D.C. 348, 359 F.2d 1014 (1966); Ford & Kimble v. United States, 122 U.S.App.D.C. 259, 352 F.2d 927 (1965).

■ We think the District Court's findings and conclusions are in conformity with the evidence. The District Court found that Mrs. Burwell, who owned the apartment, and appellant's mother, who occupied a room there, had cooperated with the police and voluntarily given information incriminating appellant. These statements which had been reduced to writing and signed, constituted strong probable cause for the police to arrest appellant. More than that, the police had strong cause to arrest the suspect at a particular place for they were also told specifically that appellant was in the habit of visiting Mrs. Burwell's apartment on Sunday evenings to watch a certain television program. There is nothing in the record which would negative the applicability in this case of the natural inference that one who initiates giving information to the police, both of the identity of a particular suspect and of the fact that the suspect can be found in his home at a particular time, thereby manifests his consent to an entry by the police at that time for the purpose of arresting that suspect.

■ The entry by the police into the Burwell apartment, solely to arrest and without any search, was not one which trammeled on the general protection provided by the Fourth Amendment for the security of the home against warrantless entry by the agents of the Government. On the contrary, Mrs. Burwell's awareness that the police would probably arrive at her home at the date and time she had focused is really a greater protection than that which she would have obtained

from the usual magistrate's ex parte warrant, with no specification beyond the general rule of prompt execution by the police. Moreover, the absence of any search within the apartment makes it unnecessary for us to consider whether or to what extent this kind of consent to entry for the purpose of arrest confers corollary authority to search the area controlled by the suspect at the time of arrest. *See* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The facts of this case also make it unnecessary to consider the police practice at the time of the arrest of not seeking arrest warrants on weekends. The District Court determined that this is no longer the practice. Instead arrest warrants are now sought on weekends from the recently appointed Magistrates. *See* Dorman v. United States, *supra.*

■■ The appellant has a privacy interest in the security of his person against unreasonable seizure which is different from the householder's privacy interest in the security of his home against unreasonable search. As to this we agree with the District Court that in view of the circumstances his objection to a warrantless arrest is no more forceful than that of a person who objects to being arrested without a warrant in a public place. In *Dorman,* we approved the rule of *Ford & Kimble, supra,* that a warrant is not required for an arrest on probable cause in a public place. The Fourth Amendment is a protection for the right to be let alone, free from unreasonable official intrusion into a private sanctum whether that intrusion be in the form of a knock on the door at midnight or the monitoring of a telephone conversation in a public phone booth. *See* Katz v. United States, 389 U.S. 347, 350–351, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967). It is not a shield against the inevitable loss of privacy which accompanies one's decision to go out into the world and mingle with his fellow man. A visitor in someone else's home is not protected by the Fourth Amendment from the risk that the owner will

consent to the entry of the police.[5] When appellant decided to visit the Burwell apartment, he had no right to demand that Mrs. Burwell make her home a sanctuary.

■ Our conclusion that the police acted lawfully when they took custody of the appellant and removed him from the apartment leads inescapably to the conclusion that the police acted lawfully when they searched appellant in the stairwell outside of Mrs. Burwell's apartment and then found and seized the knife. The police had clearly adequate grounds to fear that appellant was armed and dangerous, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and the search was well within the scope authorized by Chimel v. California, *supra*.

III. *Refusal to Put on the Stand a Witness Who Had Indicated That He Would Invoke His Privilege Against Self-Incrimination*

Appellant gave testimony that on the night of March 13, at around 11:30 p. m. he encountered Raymond Smith, Yvonne Smith and Jerry Neely in the 1300 block of T Street, N.W., and that Raymond Smith said to him, "Man, I just got me one. I just got me a man up the corner. If the police get me, I am going to tell them that Jerry did it."

To buttress appellant's defense that it was Smith and not he who killed Ingham, Neely was called as a witness for the defense. Neely corroborated appellant's account of the conversation with Smith. He testified that Smith had said that he had just got one on R Street. Melvin Royal also testified that Smith had come to him looking for Neely and saying that Neely had been telling people that he had killed a soldier.

The District Court did, however, refuse to permit appellant to call Smith as a witness after it had ascertained, out of the presence of the jury, that Smith intended to invoke his privilege against self-incrimination and would refuse to answer questions put by appellant's trial counsel. Defense trial counsel thereupon requested a missing witness instruction, and the court indicated its view that such an instruction was not appropriate since Smith "was not available to either side." When counsel persisted that he was available, the Court answered, "Not if he invokes his constitutional privilege." Finally defense argued that the fact that Smith had invoked his privilege should be brought to the attention of the jury. The Government objected and the court indicated that it was inclined to agree that no mention should be made as to why Smith was not called as a witness. The court reserved a final ruling, however, to afford defense an opportunity to assemble its authorities. Just before closing argument the court reverted to the problem and ruled, on the authority of Morrison v. United States, 124 U.S. App.D.C. 330, 365 F.2d 521 (1966) that counsel should "refrain from any mention of the decision made by Raymond Smith to invoke the Fifth Amendment."

■■ We find no error in these rulings. It is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense. Billeci v. United States, 87 U.S.App.D.C. 274, 184 F.2d 394 (1950). The rule is grounded not only in the constitutional notion that guilt may not be inferred from the exercise of the Fifth Amendment privilege but also in the danger that a witness's invoking the Fifth Amendment in the presence of the jury will have a disproportionate impact on their deliberations. The jury may think it high courtroom drama of probative significance when a witness

---

5. Weaver v. Lane, 382 F.2d 251 (7th Cir. 1967); Friedman v. United States, 381 F.2d 155 (8th Cir. 1967); Nelson v. California, 346 F.2d 73 (9th Cir.), cert. denied, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965); *see* United States v. Missler, 414 F.2d 1293, 1302 (4th Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970).

"takes the Fifth." In reality the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination. Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724 (1964).

An obvious corollary to these precepts is the rule that a witness should not be put on the stand for the purpose of having him exercise his privilege before the jury. See Fletcher v. United States, supra. This would only invite the jury to make an improper inference. For the same reason no valid purpose can be served by informing the jury that a witness has chosen to exercise his constitutional privilege. That fact is not one the jury is entitled to rely on in reaching its verdict.

The other side of the coin, however, is the rule that the jury is not entitled to draw any inference from a failure to testify that is ascribable to the witness's reliance on his Fifth Amendment privilege. Morrison v. United States, supra. Indeed, this court has held it inappropriate to spark a missing witness inference against the party who would have been called on to produce a witness to incriminate himself. Pennewell v. United States, 122 U.S.App.D.C. 332, 353 F.2d 870 (1965).

In the instant case the District Court properly admonished counsel to make no mention in their closing argument of the lack of testimony from a witness counsel knew would have invoked the Fifth Amendment. Certainly the judge was correct in refusing to charge the jury that an inference could be drawn from the absence of such a witness. Morrison v. United States, supra.

However, the trial judge could properly have given a neutralizing instruction, one calculated to reduce the danger that the jury will in fact draw an inference from the absence of such a witness. Morrison v. United States, supra. Had either counsel requested the court to instruct the jury that they should draw no inference from Smith's absence because he was not available to either side, it would have been error to refuse this instruction. Appellant's trial counsel did not request such an instruction. There are meaningful tactical reasons why a defense trial counsel might elect not to seek such an instruction.[6] Had such an instruction been sought in this case, the District Court, which noted in colloquy with counsel that Smith "was not available to either side," would undoubtedly have granted the request. As it is we see no error in the court's handling of the issues presented when Smith decided to invoke his Fifth Amendment privilege.

We have considered other contentions presented by appellant's counsel.[7] We find no reason for reversal.

Affirmed.

6. The tactical considerations may be elucidated in terms of the facts of the case before us as follows: Defense trial counsel might well conclude that while a jury would readily understand for itself that defendant couldn't be expected to produce as a witness a man (Smith) who would testify that he had killed the deceased, it might have expected—in terms of inquiring whether there was a reasonable doubt of guilt—that the Government would have called Smith to testify that he had not killed the deceased. The possibility for arousal of a reasonable doubt in the minds of the jurors would have been removed by a neutralizing instruction from the court.

In view of this tactical consideration the case cannot fairly be viewed as involving a failure to seek or provide an instruction that calls for reversal under the plain error doctrine.

The defense might feel more in need of this kind of instruction when there is a danger that the jury will doubt the existence of a person who does not appear as a witness. Here the existence of Smith was corroborated by two witnesses other than appellant.

7. Two other issues raised by appellant do not require extensive discussion. Appellant sought to testify that at the time of his arrest he had told the police that

BAZELON, Chief Judge (dissenting).

Appellant was convicted by a jury of first degree murder and sentenced to imprisonment for life.[1] The gravity of the charge and the severity of the sentence have led me, under familiar principles, to scrutinize the record with particular care.[2] The first question encountered in this review is whether the evidence was sufficient to support the conviction.

## I.

The evidence linking appellant with the killing was a statement made to his mother and her friend Mary Burwell on the afternoon following the crime, and a knife found in appellant's possession when he was arrested five days later.[3] While this evidence was far from overwhelming,[4] it was sufficient to connect Bowles with Ingham (the deceased soldier), if believed by the jury. The prosecution's theory to raise the killing to first degree murder was that Bowles had taken Ingham's life while "perpetrating or * * * attempting to perpetrate * * * robbery."[5] Testimony describing the scene of the killing did suggest that someone had robbed Ingham as he lay in the alley. But there the prosecution's evidence stopped; "there is no evidence, *either direct or circumstantial* which indicates" that Bowles robbed Ingham. Borum v. United States, 127 U.S.App.D.C. 48, 49, 380 F.2d 595, 596 (1967). "He was not shown to have been in possession of any of the stolen property." Hiet v. United States, 124 U.S.App.D.C. 313, 314, 365 F.2d 504, 505 (1966) (Prettyman, J.). Moreover, the FBI Laboratory's Analysis of Negroid hairs found on Ingham (who was white) determined that they were not appellant's.

While the facts presented to the jury might support the conclusion that a robbery had taken place, they fell short of leaving one "under no delusion as to [Bowles'] intent" as the court found in sustaining the robbery conviction in Accardo v. United States, 102 U.S.App.D.C. 4, 249 F.2d 519 (1957). The evidence was equally consistent with other reasons for the appearance of a robbery at the death scene. Since every element of the charge must be proven beyond a reasonable doubt, proof that the necessary specific intent to rob was merely probable is insufficient to sustain the conviction. *See* Cooper v. United States, 94 U.S.App.D.C. 343, 218 F.2d 39 (1954); Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

Smith had committed the killing. The general rule, subject to rare exceptions not applicable here, holds that testimony concerning prior consistent statements is inadmissible. *See* 4 J. Wigmore, Evidence § 1124 (3d ed. 1940).

Appellant also contends that the trial judge abused his discretion in allowing appellant to be impeached by two 1957 petit larceny convictions and a 1964 housebreaking conviction. The court indicated that it would allow impeachment with these convictions in appellant's record because they involved dishonest conduct. Moreover the court confined impeachment to appellant's most recent petit larceny and housebreaking convictions. We see no basis for concluding that the court abused its discretion. *See* United States v. White, 138 U.S.App.D.C. 364, 427 F.2d 634 (1970).

1. Appellant also received a concurrent three to ten year sentence for assault with intent to rob, 22 D.C.Code § 501 (1967), as a lesser included offense on a count charging robbery. *Id.* § 2901.

2. *See, e.g.,* Lampe v. United States, 110 U.S.App.D.C. 69, 70, 288 F.2d 881, 882 (1961) (*en banc*); Tatum v. United States, 88 U.S.App.D.C. 386, 388 n. 3, 190 F.2d 612, 614 n. 3 (1951), and cases cited therein.

3. Dr. Linwood Rayford, who performed the autopsy, stated that Ingham's fatal wound was 5½″ deep. He testified that *any* knife with a blade about 5½″ long (appellant's knife had a 4″ blade) could have inflicted the wound. The FBI reported that no blood, hair or cloth fibers were found on appellant's knife.

4. The problems raised by Bowles' "confession" are discussed at pp. 544–545 and note 8 *infra.*

5. 22 D.C.Code § 2401 (1967).

There is no burden on a defendant to elaborate on the prosecution's ambiguous or inconclusive evidence,[6] at the risk that the court will otherwise permit the jury to "act on what would necessarily be only surmise and conjecture, without evidence." Campbell v. United States, 115 U.S.App.D.C. 30, 32, 316 F.2d 681, 683 (1963), quoting Cooper, supra, 94 U.S.App.D.C. 343, at 346, 218 F.2d at 42. Even if such a burden did exist, it seems to me that it was adequately met in this case, through evidence which the prosecution itself introduced. The only motivation provided for the alleged murder was contained in Mrs. Burwell's testimony that Bowles had "said he don't like for anyone to put his hands in his face." This "explanation" on appellant's part suggests manslaughter rather than felony murder based on an intent to rob. Since there was "substantial evidence to support [a] reasonable hypothesis of innocence" of intent to rob, there was no "jury question presented on the issue of" felony murder, and the case should have been submitted to the jury only on the lesser offense of manslaughter.[7] Hunt v. United States, 115 U.S.App.D.C. 1, 4, 316 F.2d 652, 655 (1963). See Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967) (first degree murder conviction set aside for insufficient evidence of premeditation).

## II.

The trial court refused to allow appellant to call as a witness one Raymond Smith, who appellant contended was the person who had actually killed the soldier. The court would not allow Smith to take the stand because he said he would not testify for fear of self-incrimination. The court could not, of course, have compelled Smith to testify, once he had asserted his Fifth Amendment privilege to remain silent. Ellis v. United States, 135 U.S.App.D.C. 35, 416 F.2d 791 (1969). Appellant contends, however, that his Sixth Amendment right to compel testimony included the right to have Smith assert his privilege against self-incrimination in the jury's presence. The fact that there were other witnesses who supported Bowles' story that Smith was the one actually responsible for the killing bolsters this position, for it indicates that Bowles was not merely fabricating a story and then buttressing it with Smith's refusal to testify. Yet, in the jury's view, the failure of Smith to appear could not help but make much less credible Bowles' protestations of innocence and his explanation that his "confession" to his mother was only the braggadocio of a poor, unsuccessful man.[8] Furthermore, under the jury's

---

6. The court rejects appellant's contention that the Government's evidence was inadequate to go to the jury on first degree murder, because it finds that appellant did not "negative" the harmful inference with "some other explanation" of the evidence. Supra at 4.

7. For the same reasons, the robbery count should also have been withdrawn from the jury's consideration.

8. Bowles claimed that his "confession" was not given in earnest, but was only an attempt to take credit for a "big deed." There is support in the record for this claim: (1) Mrs. Burwell testified that Bowles asked his mother and her whether they had heard about the killing "over the radio"; (2) when Bowles "confessed" to his mother, Mrs. Burwell said the mother replied "that's your business. You are 35 years old. You do what you want to do"; (3) Mrs. Burwell stated that ap-

pellant joked a lot and that she did not know whether his confession was a joke, although he had said it wasn't; (4) Bowles' mother stated that he told her that he was only joking, after Mrs. Burwell had left the room; (5) three days after the killing, Mrs. Burwell was with a police officer at her apartment when Bowles came in, but she had not taken Bowles' story seriously enough to report it to the policeman.

Consideration of the "confession" is complicated by the fact that the trial judge failed to instruct the jury (in accordance with Model Instruction #36) that it should consider the admissions attributed to Bowles only if it found substantial independent evidence which corroborated the statements. See Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1945); Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Scarbeck v. United

eyes a witness may decide to testify instead.

Fletcher v. United States, 118 U.S. App.D.C. 137, 332 F.2d 724 (1964), relied on by the majority, is not to the contrary. In *Fletcher*, a robbery conviction was reversed where the Government put on the stand a juvenile who had told the grand jury that Fletcher had participated with him in the robbery. Although the juvenile "had already been subject to the jurisdiction of the Juvenile Court and committed to a training school,"[9] at Fletcher's trial he asserted his Fifth Amendment right to refuse to answer any of the Government's numerous questions concerning his knowledge of Fletcher and the crime. Drawing on Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), this court found two distinct grounds of error in this situation:

> One of these grounds relates to prosecutorial misconduct, and the other "seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant."[10]

This reasoning may not apply to a case, such as the one now before us, in which it is the defense, not the prosecution,[11] which is attempting to obtain his testimony.[12]

Yet we need not decide whether, by analogy to *Namet* and *Fletcher*, all inferences based on a refusal to testify are improper.[13] In the present case, the en-

---

States, 115 U.S.App.D.C. 135, 155, 317 F.2d 546, 566, cert. denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963).

9. 118 U.S.App.D.C. at 140, n.5, 332 F.2d at 727 n.5.

10. *Id.* at 139, 332 F.2d at 726, *quoting* 373 U.S. at 187, 83 S.Ct. 1151, 10 L.Ed.2d 278.

11. The differing situations of the defense and prosecution, which we have recognized in other contexts, *see, e.g.,* McRae v. United States, 137 U.S.App.D.C. 80, 420 F.2d 1283 (1969), is central to an understanding of the appellant's contention. *Cf.* Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149 (1960). The position of a defendant asserting his Sixth Amendment right to bring witnesses before the jury is not analogous to that of a prosecutor attempting to insinuate that a defendant is guilty because his confederates refuse to answer incriminating questions. *See Fletcher, supra.* This tactic on the prosecutor's part is equivalent to an outright denial of the defendant's Fifth Amendment right to remain silent, and it is unconstitutional to employ a defendant's silence as an element of the proof needed to convict beyond a reasonable doubt. Fontaine v. California, 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). By contrast, when the accused suggests that another person is the culpable party, the other's refusal to testify is merely being used as corroboration.

12. The present case is, in fact, much closer to Wilkes v. United States, 136 U.S.App. D.C. 102, 419 F.2d 684 (1969), in which we denied a similar Sixth Amendment claim, but only because Wilkes withdrew his co-defendant, one Morgan, as a witness after he determined (out of court) that Morgan would "take the Fifth." We concluded that Wilkes' "trial counsel apparently made the tactical decision that appellant's case was better served by forgetting about Morgan than it would have been for counsel to put the co-defendant on the stand and make him invoke the Fifth Amendment." *Id.,* 136 U.S.App.D.C. at 103, 419 F.2d at 685. No such "tactical decision" can be said to have been made in the present case; Bowles' counsel attempted to have Smith testify before the jury, even to invoking his privilege before them, and in lieu thereof he sought a missing witness instruction, lest it appear to the jury that Bowles' testimony concerning this "Mr. Smith" had been so much pure fabrication.

13. There is some danger that a defendant might misuse the inference from another's refusal to testify. This potential abuse is mitigated, however, by jurors' natural skepticism of any "buck passing," and by the prosecutor's right to demonstrate to the jury that the person accused by the defendant is someone on whom he has prevailed (through friendship, or by threats of injury) to come to court and then refuse to testify.

tire defense was that Raymond Smith and not appellant was responsible for the murder. Since the jury was not permitted to hear Smith testify (or refuse to do so on grounds of self-incrimination), I believe the trial court's failure to instruct the jury that no inference should be drawn from Smith's absence on the witness stand was plain error. The need for such an instruction was especially great in a first degree murder case where the evidence of guilt was so thin. The record indicates that the court below was aware that no inference unfavorable to the accused should be drawn, but it failed—probably only through inadvertence—to convey this point to the jurors. In my view, this defect is too important for us to overlook.

### III.

Finally, since I conclude that appellant's conviction should be reversed for insufficient evidence and for the prejudice caused by the trial court's failure to instruct regarding the inference from witness Smith's absence, I do not reach the question whether appellant's arrest (and the incidental search) at his mother's apartment was proper in the absence of an arrest or search warrant. On remand, the District Court found that there was no explanation for the failure to obtain a warrant, since judges were available at the relevant times to issue a warrant. I remain unconvinced by the two justifications which are advanced by the court today: (1) that the police have subsequently changed their procedures, and (2) that one who tells the police that a person usually visits his home at a certain time gives "constructive consent" to the police searching for that person. I note, however, that the absence of a warrant in this case was mitigated somewhat by the full written statements of Mrs. Bowles and Mrs. Burwell which existed prior to the arrest and search.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

The only evidence connecting appellant with this crime is his statement to his mother in the presence of her friend that he had killed a soldier in an alley. No description of either the soldier or the alley or the reason for or circumstances surrounding the killing was included in the statement. Appellant testified that he was joking when he told his mother he had killed a man, that he had heard of the killing from one Raymond Smith, and that on the night in question Smith bragged of killing the victim in this case, stating: "Man, I just got me one. I just got me a man up the corner." This apparently was the same story appellant had told the police from the time of his arrest, and it was fully corroborated on trial by two other witnesses who testified they had heard Smith say the same thing. Under the circumstances it is doubtful that the case should have gone to the jury at all. Certainly one would feel less uneasy about this conviction if there were at least some evidence, other than appellant's statement to his mother, to support it. *Compare* Smith v. United States, 348 U.S. 147, 153, 75 S.Ct. 194, 99 L.Ed. 192 (1954); Opper v. United States, 348 U.S. 84, 89–90, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

In any event, appellant is entitled to a new trial. Appellant produced Raymond Smith as a witness. Before allowing Smith to testify before the jury, the trial court determined that Smith would assert his rights under the Fifth Amendment if questioned about the killing. Whereupon the court refused to allow him to be produced before the jury and instructed counsel not to refer to the matter in their closing arguments to the jury. No instruction on the subject was given the jury by the court. Thus the jury was permitted to draw the inference that appellant's defense was framed—otherwise he would have produced Smith.

Pretermitting the question whether appellant had a right to place Smith on the witness stand before the jury, at the very least appellant was entitled to an instruction which would neutralize any inference arising from the failure to produce him. The majority admits as much

and says that in the future such an instruction should be given. In the meantime appellant has a life sentence to serve. I cannot help but believe that if such an instruction had been given in this admittedly borderline case, the jury, or at least one juror, might have been unable to conclude beyond a reasonable doubt that appellant was guilty of first degree murder.

I respectfully dissent.