UNITED STATES of America, Plaintiff,

v.

Richard Kenneth BEYE, Appellant.

No. 24418.

United States Court of Appeals, Ninth Circuit.

July 8, 1971.

Ely, Circuit Judge, dissented and filed opinion.

---

William N. Fielden (argued), La Jolla, Cal., for appellant.

Shelby Gott, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., San Diego, Cal., for appellee.

Before MERRILL and ELY, Circuit Judges, and CROCKER, District Judge *

PER CURIAM:

Beye appeals from his conviction for knowingly concealing or facilitating the transportation of marijuana in violation of 21 U.S.C. § 176a and for knowingly concealing or facilitating the transportation of illegally imported amphetamine tablets and barbiturate capsules in violation of 18 U.S.C. § 545.

■ Appellant relies primarily upon the argument that he was the victim of an unlawful search and seizure. We find no merit in this contention. The discovery of the drugs occurred at an immigration checkpoint in the course of a lawful search for aliens. See, e. g., Fumagalli v. United States, 429 F.2d 1011 (9th Cir. 1970).[1]

■ Appellant also asserts as error the court's refusal to permit him to call as a witness one who had been indicted with him as codefendant but as to whom a mistrial had been declared. The court had been advised that this proposed witness would assert his privilege against self-incrimination if questioned about the offense. A hearing out of the presence of the jury served to satisfy the court that such would indeed be the result were the witness called to the stand. Appellant contends, however, that he was entitled to require the witness to take the stand and invoke his privilege in the presence of the jury. Bowles v. United States, 439 F.2d 536 (D.C.Cir.1970), holds to the contrary and we agree.

Other points asserted by appellant we find to be without merit.

Judgment affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. As I see it, the record is replete with error, and I would, if I could, reverse the judgment of conviction for several reasons.[1]    I

---

* Honorable M. D. Crocker, United States District Judge for the Eastern District of California, sitting by designation.

1. Although (as Judge Ely mentions in his dissent, footnote 1), the drugs were found secreted in a part of the car that had been searched when it crossed the border, there was evidence from which it could be deduced that the drugs had originally been hidden beneath the car in an area that had not been searched.

1. In urging reversal, Beye specifies three alleged errors: (1) that the search that disclosed the marijuana and drugs violated his constitutional right to be free from unreasonable searches, (2) that findings of fact and conclusions of law relating to the motion to suppress were neither

think it more desirable, however, to direct my principal dissenting comments to only one contention, *i. e.*, that the trial judge erred in refusing to allow Beye to present his former codefendant as a defending witness. In my judgment, that refusal deprived Beye of an essentially fair trial, and the majority's disposition of the issue subverts one of the most basic guarantees of the Constitution.

After our court had given long and careful consideration to Beye's Sixth Amendment claim, and while, in fact, various proposed opinions were in circulation, the United States Court of Appeals for the District of Columbia, sitting en banc, resolved a similar contention. Bowles v. United States, 439 F.2d 536 (D.C.Cir.1970). My Brothers dispose of Beye's contention by adopting the majority opinion of the *Bowles* court. I prefer the approach taken by Chief Judge Bazelon, dissenting in *Bowles*, but I believe I can demonstrate that even the *Bowles* majority, had it

been presented with the facts now before our court, would have reached an opposite conclusion. To do this, it is necessary that I first set forth, in more detail, the chronology of the events in the District Court, emphasizing, in contrast to *Bowles*, how greatly more prejudicial was the procedure in our case.

Gene Curtis Smith, the man whom Beye sought to call to the witness stand, had been indicted as a codefendant on charges identical to those of which Beye was convicted. In his opening statement to the jury, Smith's attorney announced that

> "[t]he defendant Smith, Curtis Smith, will take the witness stand and will testify as to why they went and how they went to Mexico, what they did when they were in Mexico, who they met when they were in Mexico, and how he happened to be driving as they approached the Salton Sea, and he will testify that he did not know the marijuana was in the car. He will testify

drawn nor filed, and (3) that the trial judge refused to allow Beye to present his former codefendant as a defending witness. While I shall extensively discuss only the last point, I note my concern over two additional problems which were neither briefed nor argued: (1) one of the jury instructions, though unobjected to at trial, was plain error because it suggested to the jury that certain necessary elements of the crime had been established, and (2) it is unclear whether the evidence presented by the Government—all circumstantial—was sufficient to establish guilt. The clearly defective jury instruction reads:

> "You are instructed that the marijuana and merchandise referred to in the indictment should have been invoiced prior to its introduction into the country."

Although the court properly instructed the jury that the Government was required to prove that the defendant had knowledge of the fact that the marijuana and merchandise had been illegally imported, it failed to instruct the jury that the Government had the burden of proving the fact that the marijuana and merchandise had actually been illegally im-

ported. This, coupled with the fact that the quoted instruction assumes that the marijuana and merchandise had been illegally imported, constitutes plain error.

As to the proof, the Government relied on circumstantial evidence to establish two necessary elements of each charge: (1) that the marijuana and pills had been illegally imported, and (2) that the defendant knew that they had been illegally imported. No proof was offered to show that either the marijuana or the pills had characteristics peculiar to drugs of Mexican origin or characteristics which would have led the defendant to know that they had been imported from Mexico. Instead, the Government showed that a search of the defendant's car, conducted some five hours after he had entered the United States, revealed contraband hidden between the left and right door panels and under the back seat. As the record reveals that these areas of the car, at least, had been thoroughly searched when the defendant crossed the border, I tend to believe that the Government's proof was deficient. *Cf.* United States v. May, 431 F.2d 678 (9th Cir. 1970); Valenzuela-Garcia v. United States, 425 F.2d 1170 (9th Cir. 1970); United States v. Scott, 425 F.2d 55 (9th Cir. 1970).

as to this fact, we're sure. He will offer no explanation on how it got into the car. He has none; but one thing he is sure: he's sure he didn't know it was there. And I imagine Mr. Milchen will cross-examine him at great length, and it will be for you to judge his credibility."

Thereafter, a mistrial was granted as to Smith, he was excused, and the trial of Beye continued. Thus, when Beye was later refused permission to call Smith as a witness, the jury was deprived of any opportunity to hear Smith exculpate Beye, had he finally chosen to present such testimony, or if he maintained his refusal to testify, to draw any inference opposing the representation which Smith's attorney had made to the jury at the very beginning of the trial. As I see it, the prejudicial statement made by Smith's attorney in our case, a circumstance not present in *Bowles*, clearly distinguishes the two cases.

In *Bowles* the defendant had been convicted by a jury of first degree murder, and both he and another testified that one Raymond Smith had told them that he, Smith, had killed the murdered soldier. The District Court refused to permit Bowles to call Smith as a witness after it had ascertained, outside the jury's presence, that Smith would invoke his Fifth Amendment privilege. The district judge ruled that neither side should mention Smith's decision to invoke his privilege against self-incrimination. The Court of Appeals found no error; however, it carefully noted that had either party requested a neutralizing instruction to the effect that Smith was unavailable as a witness and that the jury could draw no inference whatsoever from the fact that he did not testify, a refusal of such a requested instruction would have constituted error. *Bowles,* supra at 542. Both Judges Bazelon and Wright, in their separate dissents, viewed the failure to give this neutralizing instruction, requested or not, as reversible error. *Bowles, supra,*

at 546–547. Here, no such neutralizing instruction was given, and I believe it unthinkable that the jury did not improperly infer, in the light of the quoted representation by the attorney for Beye's codefendant, the codefendant's having been excused as a defendant, and his failure to be called as a witness in Beye's behalf, that Beye was indeed guilty. The trial judge gave the jury no instruction relating to Smith's failure to be called as a witness and gave only the usual, general instruction to the effect that statements of counsel are not evidence. To negate any possible inference harmful to Beye, the court should have either permitted Beye to produce Smith as a witness or given such a neutralizing instruction as that suggested by the District of Columbia Circuit in *Bowles*.

Now turning my attention to the significant Sixth Amendment problem, I add a few thoughts of my own as to why I am so very firmly convinced of the soundness of Chief Judge Bazelon's dissenting opinion in *Bowles*.

When Beye proposed to call Smith as a witness, Smith advised the court that he would assert his privilege against self-incrimination if asked about any of the facts of the offense. After a hearing out of the presence of the jury, the court ruled that Beye could not call Smith to the stand, even to have him sworn as a witness. Beye concedes that if Smith had been called as a witness he could have properly refused to answer all relevant questions. However, he challenges the trial judge's refusal to require Smith to take the stand and invoke the privilege in the presence of the jury, arguing that this action deprived him of his Sixth Amendment guarantee to compulsory process for obtaining witnesses.

The Supreme Court defined the constitutional guarantee on which Beye relies in Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Under *Washington* the Sixth Amend-

ment guarantee of compulsory process means, at least, that a defendant may not arbitrarily be denied the right to call a competent witness whose "testimony would have been relevant and material to the defense."[2] *Id.* at 23, 87 S.Ct. at 1925. Thus, there are two questions: (1) whether the trial court's refusal to allow Beye to call Smith was an arbitrary denial and (2) whether Smith, who was physically and mentally capable of testifying to events that he had personally observed, could have presented testimony that would have been relevant and material to the defense.

The trial court ruled, as we know, that Smith, in the exercise of his privilege against self-incrimination, could refuse to take the stand and be sworn. I hold that this was error. While it is universally held that the defendant in a criminal prosecution may exercise the privilege by refusing to take the stand at his own trial,[3] this rule should not be applicable to Smith since he had ceased to hold the status of defendant in the trial. Our court, recognizing the distinction in another context,[4] has written that "[u]nder the historical development of the privilege against self incrimination, it is only in direct defense of a crime that a defendant does not have to be sworn (or affirm) and take the stand." Wollan v. United States, 244 F. 2d 212, 214 (9th Cir.), rev'd on other grounds sub nom. Simpson v. United States, 355 U.S. 7, 78 S.Ct. 14, 2 L.Ed.2d 22 (1957). The exception allowing a defendant on trial to refuse to take the stand derives from the concern that he would confront a dilemma if he were called by the prosecution and declined to answer questions on Fifth Amendment grounds. Since the jury might likely infer guilt from the mere assertion of the privilege, the defendant would be compelled to choose between waiving his privilege and remaining silent at the risk of a damaging inference being drawn against him. United States v. Scully, 225 F.2d 113 (2d Cir.), cert. denied, 350 U.S. 897, 100 L.Ed. 788, 76 S. Ct. 156 (1955). To impose such a choice impermissibly depreciates the value of the constitutional privilege. *See* Griffin v. California, 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229 (1965).

No such dilemma would have confronted Smith had he taken the stand in this case, since the jury was not sitting to determine his guilt or innocence. Smith's rights would have been adequately protected had he taken the stand in the presence of the jury and refused to answer those questions that he believed would have tended to incriminate him. The fact of such refusal could not have been proved by the prosecution in any subsequent trial concerned with the determination of the guilt of Smith himself unless, perhaps, as impeachment in the event of Smith's testifying in his own behalf. *See* People v. Snyder, 50 Cal.2d 190, 324 P.2d 1 (1958). Since the trial judge erroneously concluded that Smith's privilege entitled him to refuse to take the stand, the question whether Beye was thereby prejudicially

---

2. In *Washington* the Court first held that the Sixth Amendment right of a defendant in a criminal case to compulsory process for obtaining witnesses applied to the State through the Fourteenth Amendment. It then invalidated a Texas statute which had disqualified persons charged as principals, accomplices, or accessories in the same crime from serving as witnesses for each other. The Court stated its holdings as follows:

"We hold that the petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense."
*Id.* at 23, 87 S.Ct. at 1925.

3. 8 Wigmore, Evidence, § 2268 (McNaughton rev. 1961).

4. The case involved the right of an individual to refuse to respond to a subpoena and take the stand for grand jury and congressional investigations.

deprived of his right to compulsory process depends upon whether Smith's testimony, or silence, might have been relevant and material to Beye's defense.

It appears that, except for one period of several hours, Smith was Beye's constant companion on the Mexican trip that immediately preceded their arrest. Therefore, it is highly probable that Smith had knowledge of facts which were relevant and material to Beye's defense and that his testimony, if given, could have corroborated Beye's alibi.[5] However, the Government argues that since Smith was unwilling to testify and probably would have been instructed by his attorney to refuse to respond to all relevant questions,[6] Smith's "testimony" could not have been relevant and material to the defense. I reject such an interpretation of *Washington* for two reasons: (1) the possibility that Smith might, once sworn as a witness, decide to change his mind and testify warrants the conclusion that his "testimony would have been relevant and material to the defense," and (2) even had he not testified, his invocation of the privilege, in and of itself, would have been "testimony relevant and material" to Beye's defense. I discuss these points separately.

I interpret the key phrase from the *Washington* opinion as requiring only that the witness be knowledgeable as to facts that would, if elicited at trial, be relevant and material to the defense. When such a proposed witness declares, in advance, that he intends to invoke his privilege, the defendant's right to compulsory process should include his right to test the firmness of the witness' in-

tent by placing him on the stand in the presence of the jury and causing him to be sworn or to affirm. This procedure insures that the witness understands the significance of his refusal to testify. By giving him the opportunity to reflect on his initial, informally announced intention, the procedure may decrease the possibility that he might seek to rely on the privilege for any improper reason, such, for example, as the fear that he would, or might, incriminate someone else. It eliminates the possibility that he might rely on the privilege simply to avoid being present, and it is the only practicable way of determining whether he will actually persevere in his refusal to testify.

My conclusion would, however, remain the same even if it were crystal clear, as an established fact, that Smith would indeed have refused to testify. The refusal, itself, would have been "testimony relevant and material to the defense." The Government suggests that the opposite conclusion is correct, contending that Smith's refusal to answer questions concerning the crime would not "in any manner" suggest that he acted alone in the commission of the crime. It argues that Smith's incentive to claim the privilege would have been the same "whether he acted alone, with the accused on trial, or with another different person." Hence, the Government maintains, to allow the jury possibly to infer Beye's innocence from Smith's reliance on the privilege would be to sanction the "hoodwinking" of the jury. This is not true. The Government emphasizes three logical inferences that might have been drawn from Smith's refusal to testify.

5. Beye's attorney planned to corroborate his client's alibi by suggesting that it was Smith who purchased the contraband. To the court, he remarked: "I think from the defendant's testimony that the night they were in Guaymas when they were in this hotel room they were separated from the hours of nine until the next morning. This fact alone could tend to show that possibly it was Mr. Smith who went out and purchased this during those hours. I would certainly ask him this question."

6. Smith's attorney stated:
"Your honor, the prosecution's case is based completely on circumstantial evidence and the inferences drawn therefrom. It would seem to me that any statements as to where [Smith] was, what [Smith] did, who [Smith] associated with, anything of this nature could be used against [Smith] in a subsequent prosecution."

In addition to these three, it might have also been inferred that Beye acted alone in committing the crimes and that Smith was reluctant to testify because it might have been incriminating for him to admit that he had accompanied Beye. Two of the four suggested inferences are consistent with Beye's innocence and the other two, with his guilt. Beye should not have been deprived of the two which could have operated to his advantage.

Here, I must reemphasize the important consideration which I have previously discussed. This is the announcement of Smith's attorney to the jury, during his opening statement, that Smith would take the stand and deny knowledge of the contraband. There was thus the danger that the jury assumed, in the light of this announcement and Smith's having been excused as a defendant, that Smith was the innocent party and Beye, the guilty. This possibility could not have been wholly eliminated, even though the trial judge very carefully admonished the jury to disregard the fact of Smith's removal. I believe that the defendant was entitled to call Smith to the stand for the purpose of attempting to demonstrate that Smith committed the crimes alone or to enable the jury to apply whatever reasonable inference it may have drawn from Smith's refusal to testify.

I cannot know, of course, the weight, if any, which the jury might have attached to Smith's appearance as a witness and his refusal, had it occurred, to testify. But it is also clear that we cannot say with assurance that if Smith had invoked the privilege in the presence of the jury, it would not have operated to Beye's advantage. In short, the inference that the offenses had been committed by Smith alone could have been logically drawn from his refusal to testify. Such an inference would have been relevant and material to Beye's defense.[7] Accordingly, Beye was deprived of his Sixth Amendment right to compulsory process.[8]

I would reverse.

---

7. I reject the Government's argument that the principles discussed in *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278, (1962), are applicable to this case. In *Namet* the petitioner contended that reversible error was committed when the Government was permitted to question certain witnesses after it was known that they would rely on their privilege against self-incrimination. The petitioner based his argument on cases which had held that, under some circumstances, it was reversible error to permit, as evidence against an accused, any adverse inference that might arise from a witness' refusal to testify. After an analysis of the rationale underlying these cases, the Court concluded that the petitioner had not been prejudiced by the trial judge's decision to allow the questioning of witnesses who were planning to invoke the privilege.

The two principles underlying the relevant cases, according to the Court, were as follows:

"First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. * * * A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant."

*Id.* at 186–187, 83 S.Ct. at 1154–1155. In reliance on these two principles, the Government here argues that an accused should not be allowed to call a witness if it is known that the witness will rely on the privilege. According to the Government, "[a]ppellee cannot distinguish why such conduct should be misconduct on the part of the prosecutor, but part of a valid defense when counsel calls a co-defendant who has indicated he will give no testimony. The 'other side of the coin' argument applies also to the second theory prohibiting such conduct. The right of cross-examination is lost to the prosecutor under such circumstances."

The answer to the Government's argument is that since, in the case before us, the party who desired to call the witness

---

See note 8 on page 1044.

was an accused asserting his Sixth Amendment right to compulsory process rather than a prosecutor attempting to meet his burden of proof, the principles are inapplicable. When the defendant relies on some of the permissible inferences that logically arise from a witness' refusal to answer, that evidence is for the purpose of showing the existence of possibilities other than the defendant's guilt. Since the witness' reliance on the privilege is used only for the purpose of emphasizing those possibilities, it is relevant and material to the defense.

The Government's second argument—that it would be deprived of its right to cross-examination if the defendant were allowed to call a witness who planned to rely on the privilege—is equally unpersuasive. In essence, the Government's argument is that its right to cross-examination should be deemed paramount to the defendant's right to compulsory process in a case, such as this, where the two rights cannot be accommodated. To this I cannot accede.

I similarly reject the Government's argument that the trial judge's ruling actually benefited the defendant and that any error should be deemed harmless for this reason. The defendant was undoubtedly correct in his insistence that "he was entitled to the right to have compulsory attendance of witnesses and that who they were to be was a matter for him and his counsel to decide." United States v. Davenport, 312 F.2d 303, 305 (7 Cir. 1963).

8. De Luna v. United States, 308 F.2d 140 (5th Cir. 1962), lends support to this conclusion. There Adolfo Gomez, one of two codefendants jointly tried in a criminal proceeding, testified in an attempt to place all the blame on the other defendant, de Luna, who did not testify. In arguing to the jury, Gomez's attorney emphasized the fact that his client had taken the stand while the codefendant de Luna had not. After the jury returned a verdict acquitting Gomez and convicting de Luna, de Luna, appealed, arguing that he was deprived of his constitutionally guaranteed right of silence free from prejudicial comments. The Fifth Circuit held that while Gomez's attorney had a duty to his client to draw the jury's attention to the possible inference of guilt from his codefendant's silence, the comment was prejudicial to de Luna and that, accordingly, the trial judge should have ordered that the defendants be tried separately.

"[C]onsidering the case from Gomez's point of view, his attorneys should be free to draw all rational inferences from the failure of a co-defendant to testify, just as an attorney is free to comment on the effect of any interested party's failure to produce material evidence in his possession or to call witnesses who have knowledge of pertinent facts. Gomez has rights as well as de Luna, and they should be no less than if he were prosecuted singly. His right to confrontation allows him to invoke every inference from de Luna's absence from the stand."

*Id.* at 143. It is unclear why the court placed partial reliance on Gomez's right to "confront witnesses." Perhaps the court had his right to compulsory process in mind.

In a specially concurring opinion, one judge specifically disagreed with the majority's conclusion that Gomez's attorney had a right to comment on de Luna's failure to testify and based his concurrence on the ground that it was reversible error for the trial judge to have allowed the comment. The concurring opinion emphasized that the majority's resolution of the issue—requiring separate trials, when one co-defendant testifies and wishes to comment on the other's failure to do so—would create an "intolerable procedural problem." *Id.* at 156. The opinion did not take issue with the majority's conclusion that a rational inference arises from a codefendant's failure to testify.

The Circuits that have discussed the *de Luna* rule have been concerned with whether the inference is reasonable in a given case (Gurleski v. United States, 405 F.2d 253, 265 (5th Cir. 1968).) and with whether the value of the inference warrants the disruption to the trial process that a severance would bring about (United States v. Kahn, 381 F.2d 824 (7th Cir. 1967)). None has questioned the validity of the inference itself or whether it can have evidentiary value.