IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 22, 2025 Session

## STATE OF TENNESSEE v. EZEKIEL ABRAHAM SCHMALTZ

**Appeal from the Criminal Court for Knox County**
**No. 119795   Hector Sanchez, Judge[1]**

_____

**No. E2024-01107-CCA-R3-CD**

_____

The Defendant, Ezekiel Abraham Schmaltz, appeals his Knox County jury convictions of two counts of observation without consent and one count of assault, for which he received an effective sentence of two years and six months' incarceration. On appeal, the Defendant argues (1) the evidence was insufficient to sustain his convictions, (2) the State committed prosecutorial misconduct by discussing punishment with the prospective jurors during *voir dire*, (3) the trial court erred by admitting extrinsic proof of the victim's prior consistent statements to rehabilitate her credibility, (4) the trial court erred by restricting the Defendant's ability to cross-examine two State's witnesses, and (5) the cumulative effect of trial errors entitles him to a new trial. Following our review, we remand the case for merger of the Defendant's convictions of observation without consent into a single conviction and the entry of corrected judgments. We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part;**
**Remanded for Entry of Corrected Judgments**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Mary J. Newton (on appeal and at trial); and Chelsea C. Moore (at trial), for the appellant, Ezekiel Abraham Schmaltz.

---

[1] This case was originally assigned to the Honorable Kyle A. Hixson prior to his appointment and confirmation to this court on September 1, 2022. Judge Hixson presided over initial pretrial matters, and Judge Sanchez presided over the remainder of the case.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott and Franklin Ammons, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

On September 29, 2021, a Knox County Grand Jury returned a three-count indictment charging the Defendant with two counts of observation without consent and one count of assault. Following pretrial motions and evidentiary hearings, the Defendant's case proceeded to trial on January 30, 2023.

The victim testified she was eleven years old at the time of the offenses. She testified that the Defendant was her paternal uncle and that she maintained a very close relationship with him prior to the offenses, describing him as her "favorite person in the whole world." The victim stated that before the offenses, the Defendant frequently visited her home and that she would occasionally spend the night at his home.

The victim recalled that the Defendant moved into her family's home, where she lived with her parents, brothers, and several family pets, approximately one week before the offenses. While there, the Defendant slept in the living room on a long couch and kept his belongings in a bag stored in the adjacent kitchen. The victim described the layout of her living room, noting that a loveseat sat adjacent to the couch on which the Defendant slept. She estimated the couch and the loveseat were between twelve and eighteen inches apart and were separated by an end table, which sat in a corner of the living room. The victim stated the loveseat was pushed against the living room wall, directly in front of a large window. She also noted that the kitchen was visible from the living room and that her family "always kept" a light on above the kitchen sink.

The victim testified that on the evening of April 21, 2021, she and her siblings completed their chores and began playing a game with the Defendant, in which the Defendant "would pick [them] up with one hand and hold [them] in the air and then drop [them]" onto the couch. She described this type of interaction between herself and the Defendant as normal. After concluding their game, the victim and her siblings brushed their teeth and went to bed. The victim took one of the family's dogs, Willow, to bed with her. The victim fell asleep, but around midnight, Willow woke her by barking, "opening all [her] doors," and "jumping on [her] bed." The victim got out of bed and exited her bedroom, whereupon she saw that the Defendant was also awake. The Defendant walked down the hallway towards the victim's bedroom and asked her what was wrong. The

victim explained Willow's behavior, and the Defendant put Willow in the bedroom shared by the victim's brothers. The victim's brothers protested, however, so the Defendant carried Willow downstairs to her kennel.

Afterwards, the Defendant asked the victim if she wanted to sleep on the loveseat in the living room, and the victim agreed. The victim testified she often slept on the loveseat and that she did not view the Defendant's request as odd. The victim returned to her bedroom and collected a stuffed animal, a pillow, and a blanket, which she then brought to the living room and used to make a bed for herself on the loveseat. The victim recalled that she fell asleep on her side, facing the couch. She also noted that she wore a pair of blue sweatpants to sleep. Because the drawstring had been removed from the waistband of her sweatpants, the victim "rolled up" the waistband of her sweatpants to her waist.

The victim testified that soon after she fell asleep, she awoke and found that she was on her back and "facing up" towards the ceiling with her legs straightened. The victim noted that her blanket had fallen onto the floor and that the sweatpants she wore were pulled down "a little bit lower than [her] waist," lower than they had been when she fell asleep. The victim testified she saw the Defendant standing over her when she awoke. When the victim asked the Defendant "what happened," the Defendant responded that he had "heard something." The victim accepted this explanation and told the Defendant goodnight. She retrieved her blanket from the floor, covered herself back up, bent her legs "in towards her stomach," and went back to sleep.

Shortly after the victim returned to sleep, she awoke again to find that, as previously, she had rolled onto her back and was facing the ceiling with her legs straightened. She testified that her blanket was on the floor and that her sweatpants had been pulled down slightly lower than they had been the first time. The victim recalled that she again saw the Defendant and again asked him what he was doing. The Defendant responded that he thought he "saw something" near the victim and had gone to investigate. The victim testified that she became frightened. She again retrieved her blanket from the floor, wrapped it around herself "like a burrito," curled her legs inwards, and went to sleep.

The victim estimated that approximately five to ten minutes later, she awoke again to find the Defendant standing over her and her sweatpants "down to where [her] underwear [was] exposed." She stated that the Defendant held her ankles in one hand and his cell phone in the other, which he used to shine a light towards the lower portion of her body. She testified that the Defendant "ran downstairs" after seeing the victim was awake. The victim stated she pulled up her sweatpants and ran to her bedroom, leaving her belongings on the loveseat. She testified that she locked her bedroom door, cried, and eventually went back to sleep.

- 3 -

The victim recalled that the Defendant visited her in her bedroom shortly after she awoke the following morning to bring her candy and the stuffed animal she had left on the loveseat. She stated the Defendant did not speak to her during this interaction. She described the Defendant's behavior during this interaction as odd; although the Defendant brought her candy daily, it was unusual for him to visit her bedroom to do so. She also averred that he would normally instruct her to collect any of her belongings she had left around the house rather than bringing them to her.

The victim testified that later that morning, the Defendant made himself breakfast, and the victim watched him leave afterwards with the victim's father to go to work. After they left, the victim "ran" to find her mother in the bedroom she shared with the victim's father. The victim sat on her mother's bed and told her that the Defendant "tried to pull [her] pants down last night." In response, the victim's mother "jumped up" and began "looking for her keys." When she was unable to find her keys, she called the victim's father, spoke with him briefly, and then handed her cell phone to the victim, who in turn told her father what happened. After speaking to her father, the victim returned to her bedroom, where she remained until the police arrived. She recalled that her father and the Defendant returned home shortly after she spoke with her father and that the Defendant did not return inside the house and instead got into his truck, which was parked "on the road in front of [the] front yard." She recalled speaking with a detective, a representative from the Department of Children's Services ("DCS"), and a forensic interviewer.

On cross-examination, the victim stated that the loveseat on which she slept was pushed against a window which did not have any blinds or curtains. She explained that she often slept in short intervals and estimated that approximately twenty minutes had passed between the time she fell asleep on the loveseat and when she first awoke. She conceded that she did not know precisely how long she had been asleep but noted that it was still dark outside.

The victim estimated that her sweatpants were roughly one to two inches below her waist when she awoke the first time. She reiterated that she pulled her sweatpants up before going back to sleep but awoke to find they were further down her waist than they had been when she awoke the first time. She stated that the final time she awoke, her sweatpants were even further down and were so low that they exposed her underwear.

The victim initially denied that she awoke an additional time, but later conceded that between the first and second times she found her sweatpants lower on her waist than they had been when she fell asleep, she woke up to use the restroom at some point between 4:00 a.m. and 5:00 a.m. When she left the living room, she saw the Defendant lying on the couch, but when she returned, she saw him sitting upright. She told the Defendant

- 4 -

goodnight, covered herself with her blanket, and went to sleep. She also noted that when she awoke the final time, it was becoming slightly light outside.

The victim again testified that when she awoke the final time, the Defendant held both her ankles in one hand and held his cell phone in his other hand, which he used to shine a flashlight towards her "waist and below." She stated she gasped when she saw what the Defendant was doing. She also testified that the Defendant did not touch any part of her body other than her ankles and that her underwear and shirt were not "disturbed" when she awoke.

The victim reiterated that she and the Defendant had maintained a close relationship and that he had never attempted to do anything inappropriate to her before the offenses. When asked how she felt about no longer being able to see the Defendant, the victim responded that she "didn't really feel anything." She initially denied stating during her forensic interview that she felt "great" about the Defendant's not being in her life anymore, but she conceded she had made the statement after a portion of her forensic interview was played. She also agreed that she stated during her forensic interview that she only really "ha[d] a relationship" with her aunt before the offenses.

On redirect examination, the victim testified that although she had to roll the waistband of her sweatpants up to her waist, they were nevertheless "tight enough that they wouldn't fall down." She also stated that her legs had been straightened by the Defendant's holding her ankles when she awoke the final time. She noted that the Defendant was "close enough to touch" her while he shone his flashlight at her. She testified that she felt afraid during the encounter. She also stated that she did not consent to the Defendant's observation of her body. On recross examination, the victim testified she told both the investigating officers and her forensic interviewer that the Defendant had used a flashlight.

The victim's mother testified that the Defendant and the victim's father worked together at a construction firm. She stated that the Defendant had previously lived in McMinn County and spent weekends at her home while he worked on construction projects with the victim's father. Eventually, the victim's parents agreed to rent a room to the Defendant to make it easier for him to commute to work. The victim's mother estimated that the Defendant moved into her home approximately three to four days before the offenses. She recalled that the Defendant slept on a couch in the living room and kept his belongings in the dining room.

The victim's mother described the Defendant's relationship with the victim prior to the offenses as "amazing" and stated that the Defendant was "like [the victim's] best friend." She testified that the victim and the Defendant were usually together when the Defendant was at her family's home. She averred that she had not seen the victim and the

Defendant argue or otherwise have any serious disagreements. She described the victim's personality as typically "bubbly."

The victim's mother testified that on the morning after the offenses, she woke up and found the victim sleeping beside her in the bed. She stated she awoke and encouraged the victim to "get up" and eat breakfast, and the victim did so. The victim's mother remained in her bed after the victim left her bedroom because she "had a couple of phone calls to make." She recalled hearing the victim's father and the Defendant leave for work while she was making those phone calls.

Shortly after the victim's father and the Defendant left for work, the victim reentered her mother's bedroom and told her she needed to speak with her. The victim's mother described the victim as "really quiet and reserved" and "emotional." She stated that the victim told her that on the previous night, while she was lying on the loveseat, the Defendant "attempted to take her pants off at least two times." The victim stated she kept "moving or repositioning herself" and pulling her pants up, but the Defendant eventually "got her pants off her bottom and around her legs." The victim's mother testified she asked the victim to repeat her story several times to ensure she understood exactly what happened. The victim's mother then called the victim's father and told him that the Defendant "took [the victim's] pants off of her last night" and that "he needed to get [the Defendant] back" home. After speaking with the victim's father, the victim's mother called the police.

A recording of the victim's mother's 911 call was played for the jury. During her call, the victim's mother requested that a police officer visit her home and provided her address. She explained that the victim had recently reported that she had been "sexually assaulted" the previous night by her uncle, who the victim's mother identified as the Defendant. The victim's mother stated that while the victim slept on the couch, the Defendant attempted to pull her pants down on three occasions. She also reported that the victim attempted to "get in a fetal position," but the Defendant "kept straightening her legs out."

While the victim's mother waited for the victim's father and the Defendant to return home, she instructed her son, the victim's older brother, to place the Defendant's belongings in his truck, which was parked in front of the home. She stated that when the victim's father and the Defendant returned home, the Defendant did not attempt to enter the home and instead walked straight towards his truck.

On cross-examination, the victim's mother testified that several officers arrived at her home after she called the police, later followed by detectives and a DCS employee. She informed the officers of the victim's allegations and that the victim had been "emotional that morning."

The victim's older brother testified that at the time of the offenses, he and the victim's younger brother shared a bedroom. He stated that the victim had her own bedroom, that his parents shared a bedroom, and that the Defendant slept on the living room couch. He estimated that the Defendant had been living with his family for "about five to six days" before the offenses. The victim's older brother recalled that he, the victim's younger brother, and the victim were occasionally permitted to keep Willow in their respective bedrooms but averred that she usually slept in her kennel downstairs.

The victim's older brother testified that on the day after the offenses, he and his brother woke up and began making breakfast for themselves. He recalled that he saw the victim once while the victim's father and the Defendant were preparing to leave for work and again after they left. He also noted that he could tell the victim had slept on the living room loveseat the night before because she had left her blanket and pillow on the loveseat and had rearranged the cushions. After he ate breakfast, the victim's older brother sat at the kitchen table and began working on his schoolwork until his mother called him and his siblings into the living room. He noted that the victim was crying. His mother sent him and his siblings to his bedroom, where they watched television and continued working on their schoolwork together.

On cross-examination, the victim's older brother clarified that while he was in the kitchen, he watched his father make coffee and noted that the Defendant "just st[ood] there waiting to get in the truck." He also noted that he saw the victim briefly enter the kitchen while the Defendant was present, but that she went back into her bedroom without eating breakfast.

The victim's younger brother testified that his family's relationship with the Defendant was "really good" prior to the offenses and noted that the victim and the Defendant "would talk a lot." The victim's younger brother stated that he was scared of the dark at the time of the offenses, so he typically slept with his closet light on and the door to the bedroom he shared with the victim's older brother open. He also noted that his parents would occasionally forget to turn off the light above the kitchen sink before going to sleep, and that he could see that light from his bed.

The victim's younger brother recalled that on the night of the offenses, he and his siblings ate dinner, brushed their teeth, and read together before they went to bed. He stated that his parents had already gone to bed but that the Defendant was still awake. Shortly after the victim's brothers lay down to go to sleep, the Defendant entered their bedroom and instructed them to close their bedroom door. The victim's younger brother found this strange but testified that he or his brother closed the door. He recalled waking up later that night to hear someone "running down the hallway" and someone "running

- 7 -

downstairs." He also stated he heard the victim crying in her bedroom for thirty to forty minutes.

The victim's younger brother testified he saw the victim's father, the Defendant, and the victim in the kitchen the following morning. He stated that the victim did not speak to anyone that morning until she returned from their mother's bedroom with their mother. The victim's younger brother also testified that the Defendant and the victim's father returned home from work shortly after leaving and noted that the Defendant did not reenter the home.

On cross-examination, the victim's younger brother recalled that Willow entered his bedroom on the night of the offenses and began jumping on his bed. He stated the Defendant eventually took Willow out of his bedroom and placed her in her kennel. Afterwards, the Defendant returned to the victim's brothers' bedroom and closed the bedroom door, telling the victim's brothers "not to open it." The victim's younger brother believed it was still dark outside when he heard the victim crying in her bedroom.

The victim's father testified that the Defendant was his younger brother and that they worked together in the family's construction business. In the course of their work, the victim's father and the Defendant occasionally took on jobs that "r[a]n over through the week," so the victim's father permitted the Defendant to stay at his home over the weekends, where he typically slept on the living room couch. He estimated that the Defendant moved into his home approximately four days before the offenses.

The victim's father testified that the Defendant maintained a good relationship with each of his children, but particularly with the victim. He stated that he and his wife "routinely" left the victim in the Defendant's care while they ran errands.

The victim's father recalled that on the morning after the offenses, he woke up and found the Defendant was awake, ready to go to work, and not talkative. He described this as odd, noting that the Defendant was typically "kind of slow" to get ready in the morning and that he usually took time to play with his niece and nephews. After the victim's father made coffee and told his family goodbye, he drove himself and the Defendant to their jobsite. As they approached the jobsite, the victim's father received a phone call from his wife, who asked him if he was alone. The victim's father stated he was not alone, and his wife asked him to call her back when he was. His wife called again approximately five minutes later, and the victim's father again told her he was not alone.

The victim's father stated that when he and the Defendant arrived at their jobsite, the Defendant "hopped straight out" of the vehicle and went to work. The victim's father then called his wife, who informed him of the victim's allegations. The victim's father

stated he was "taken aback" and had to "talk[] it through" with his wife for approximately thirty minutes to determine "exactly what happened." He recalled that his wife had already called the police when she informed him of the victim's allegations.

After speaking with his wife, the victim's father found the Defendant at the jobsite and told him they needed to return home. The victim's father testified the Defendant did not question this. While the victim's father drove himself and the Defendant back home, the victim's father asked the Defendant, "[w]hat happened last night?" The Defendant stated he did not know what the victim's father was talking about, and the victim's father informed the Defendant that the police were on their way to their home. The victim's father did not believe he provided any details about the victim's allegations when he spoke to the Defendant.

The victim's father recalled that when he and the Defendant returned home, he saw that the Defendant's belongings had been placed inside the Defendant's truck, which was parked in front of the home. The victim's father instructed the Defendant to go to his truck and stay there, and the Defendant did so. The victim's father then entered the home, locked the door, and waited for the police to arrive. He stated that the Defendant was still at his truck when the police arrived and that he remained there while the victim's father and his family spoke with the police.

On cross-examination, the victim's father noted that he also spoke with the victim during his call with his wife. He testified he waited until he and the Defendant were nearly home to confront him about the victim's allegations. He stated that when he asked the Defendant "what happened between him and [the victim], [the Defendant] denied anything happened." The victim's father testified that he attempted to give the Defendant the "benefit of the doubt" after hearing the victim's allegations. He was unsure whether he asked the Defendant if the victim "had gotten hot in the night." After reviewing portions of his statement to the police, however, he agreed that he told the police that the Defendant had "denied it all" during their ride back home. On redirect examination, the victim's father testified he did not "lay anything out" or provide "any details" when asking the Defendant about what happened between the Defendant and the victim the previous night.

Officer Kristina Kanning of the Knox County Sheriff's Office ("KCSO") testified she responded to the victim's mother's 911 call. When Officer Kanning arrived at the victim's home, she noticed "somebody" sitting in a truck "with the door open," who she later identified as the Defendant. Officer Kanning went into the victim's home and interviewed the victim's mother and the victim. She recalled that another officer, who arrived soon after she did, entered the home to "check on" Officer Kanning and then went back outside to speak with the Defendant.

Video footage taken from Officer Kanning's body camera depicting both her arrival at the victim's home and her subsequent interview with the victim was played for the jury. During her interview, the victim stated she was awakened the previous night by the family dog jumping on and off her bed. The victim asked the Defendant to take the dog away; the Defendant did so and then invited the victim to sleep in the living room. After collecting her things from her bedroom, the victim went to sleep. The victim recalled that the Defendant subsequently woke her on three occasions as he attempted to pull her pants down. She stated that she "curled up" after the first occasion, so the Defendant "would have to adjust [her] body" if he attempted to pull her pants down again. She stated the Defendant straightened her legs during his attempts. On the third occasion, the victim awoke to find her pants were lower than they had been previously. The Defendant "ran away" after his third attempt, and the victim returned to her bedroom and "started to panic."

KCSO Officer Bradley Warren testified he also responded to the victim's mother's 911 call. When he arrived at the victim's home, Officer Warren interviewed the Defendant, and a video recording of the interview taken from his body camera was played for the jury. During the interview, Officer Warren asked the Defendant what happened the previous night, to which the Defendant responded, "Apparently, I tried pulling down . . . this kid's pants last night." The Defendant stated the family dog woke the victim and her siblings around 4:00 a.m., so he took the dog to her kennel downstairs. The Defendant stated the victim then grabbed "her blankets and stuff" from her bedroom and brought them to the couch. The Defendant averred that he had been "playing" on his cell phone since 4:30 a.m. and had not been able to fully go back to sleep since then. He denied that he attempted to pull the victim's pants down and stated he did not know what was "going on."

Kelly Sanders, a forensic interviewer employed at Childhelp Tennessee, testified that she interviewed the victim on April 21, 2021. Ms. Sanders testified regarding her qualifications, her employer's accreditations, the manner in which she typically interviewed children, and the setup of her interview room. Afterwards, several portions of the victim's video-recorded forensic interview were played for the jury.

In her forensic interview, the victim stated that the Defendant took Willow downstairs after the dog woke the victim, and that he invited the victim to sleep on the loveseat. The victim agreed and brought her things from her bedroom to the loveseat. She stated this was not out of the ordinary and that the Defendant had asked her to sleep in the living room before. She recalled wearing a tank top and sweatpants to sleep. She estimated that between thirty minutes to an hour after she went to sleep, she awoke to find the Defendant attempting to pull down her pants. The Defendant explained that he came over because he "heard something." The victim repositioned herself and went back to sleep but awoke soon thereafter to find the Defendant "adjusting [her] body." The victim stated the Defendant had positioned her legs so they were straight in front of her and that he again

attempted to pull her pants down. When the Defendant saw the victim was awake, he "said the same thing" as he had before. The victim stated she then "curled up into a ball," but later found the Defendant again attempting to pull her pants down. She stated the Defendant pulled her pants down the lowest the final time she awoke. The victim recalled that the Defendant then ran downstairs and that she ran to her bedroom.

In another portion of the victim's forensic interview, she stated that the Defendant had come to stay in her family's home because he "had nowhere else to sleep" and "wanted to visit his family." She recalled that he was supposed to stay "a whole week" but was no longer doing so. The victim also noted that she could clearly see the Defendant's face when she awoke because there was a light on in the adjacent kitchen. She stated that the Defendant visited her bedroom the morning after the offenses to bring her the stuffed animal she had left on the loveseat and candy.

On cross-examination, Ms. Sanders testified she did not recall the victim's mentioning that the Defendant had used a flashlight when he attempted to pull down her pants.

The State rested. Following a *Momon* colloquy, the Defendant elected not to testify and did not present any additional proof. Upon this evidence, the jury convicted the Defendant as charged. At the Defendant's sentencing hearing, the trial court imposed a sentence of two years' incarceration for each of the Defendant's convictions of observation without consent, to run concurrently. The trial court also imposed a sentence of six months' incarceration for the Defendant's conviction of assault, which it imposed consecutively. The Defendant filed a timely but unsuccessful motion for new trial, and this timely appeal followed.

## II.  ANALYSIS

On appeal, the Defendant argues (1) the evidence was insufficient to sustain his convictions, (2) the State committed prosecutorial misconduct by discussing punishment with the prospective jurors during *voir dire*, (3) the trial court erred by admitting extrinsic proof of the victim's prior consistent statements to rehabilitate her credibility, (4) the trial court erred by restricting the Defendant's ability to cross-examine two State's witnesses, and (5) the cumulative effect of trial errors entitles him to a new trial. We will address these issues in turn.

### A. SUFFICIENCY

The Defendant argues that the evidence adduced at trial was insufficient to sustain his convictions. Specifically, he challenges the victim's credibility considering his

impeachment of her testimony during direct examination. He further asserts that the State failed to prove he acted for the purpose of sexual arousal or gratification regarding his convictions of observation without consent. The State responds that the evidence was sufficient to sustain each of the Defendant's convictions. We will address each issue in turn.

## 1. STANDARD OF REVIEW

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citations omitted); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence . . . because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

## 2. ASSAULT

First, the Defendant argues the evidence adduced at trial was insufficient to sustain his conviction of assault. As relevant here, "[a] person commits assault who . . . [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Tenn. Code Ann. § 39-13-101(a)(3).

The Defendant contends that the only proof of his committing any offense came from the victim's testimony, which he asserts was unreliable considering his impeachment of her credibility during cross-examination. He also notes that the victim's account of events varied and that her "family members' testimonies all varied regarding details of the night and morning in question." Thus, the Defendant's arguments may be summed up as a challenge to the victim's credibility and to the weight the jury afforded the testimonies of the witnesses. However, the jury is entrusted with the duty of weighing the evidence and resolving questions of witness credibility; we do not reweigh the evidence or substitute our credibility determinations for those reached by the jury on appeal. *Curry*, 705 S.W.3d at 183; *Dorantes*, 331 S.W.3d at 379. Moreover, the Defendant challenged the victim's credibility to the jury throughout his extensive cross-examination of the victim. He also identified certain inconsistencies in her statements through his cross-examination of other witnesses for the State. The jury heard the Defendant's attacks on the victim's credibility and nevertheless concluded she was a credible witness, as evidenced by its verdict of guilty.

The evidence adduced at trial, when viewed in the light most favorable to the State, supports that verdict. The proof showed that on the night of the offenses, the Defendant invited the victim to sleep in the living room after the victim was awakened by the family dog. The victim agreed and made a bed for herself on the loveseat, while the Defendant slept on the couch. As the night progressed, the victim repeatedly awoke to find that her sweatpants had been pulled down and that the Defendant was standing nearby. The final time she awoke, she found her sweatpants had been pulled down to expose her underwear, and her legs had been straightened out in front of her. She also found that the Defendant was standing over her, holding both of her ankles in one hand and shining his cell phone's flashlight towards her exposed underwear with his other hand. She testified that she felt afraid during this encounter. This evidence is sufficient to sustain the Defendant's conviction of assault by extremely offensive or provocative contact.

### 3. OBSERVATION WITHOUT CONSENT

The Defendant also challenges his convictions of observation without consent. As relevant here,

It is an offense for a person to knowingly spy upon, observe or otherwise view an individual, when the individual is in a place where there is a reasonable expectation of privacy, without the prior effective consent of the individual, if the viewing:

(1) Would offend or embarrass an ordinary person if the person knew the person was being viewed; and

- 13 -

(2) Was for the purpose of sexual arousal or gratification of the defendant.

Tenn. Code Ann. § 39-13-607(a). A defendant charged under this statute may not raise as a defense that he or she "was lawfully on the premises where the offense occurred," and "[i]f the person being viewed is a minor," then a defendant commits the offense of observation without consent "regardless of whether the minor or the minor's parent or guardian consented to the viewing." Tenn. Code Ann. § 39-13-607(b), (c).

The Defendant contends that the State failed to prove he acted for the subjective purpose of sexual arousal or gratification. Tenn. Code Ann. § 39-13-607(a)(2); *see also State v. Whited*, 506 S.W.3d 416, 440 (Tenn. 2016) (noting observation without consent "explicitly includes the subjective intent of the accused as an element of the offense"). This court has previously noted that "sexual arousal" and "sexual gratification" are amorphous terms that evade precise definitions. *State v. Morgan*, No. E2023-01815-CCA-R3-CD, 2025 WL 1604472, at *5 (Tenn. Crim. App. June 6, 2025) (citing *State v. Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *11 (Tenn. Crim. App. Feb. 7, 2013), *perm. app. denied* (Tenn. Aug. 14, 2013)), *perm. app. pending*. As with other offenses, there is rarely direct proof of a defendant's subjective intent, so it must necessarily be established through circumstantial evidence. *State v. Allison*, 618 S.W.3d 24, 40 (Tenn. 2021); *State v. Hall*, 682 S.W.3d 143, 157 (Tenn. 2019). "While, in most cases [requiring proof of sexual arousal], there is clear evidence that a defendant committing such a crime was aroused, a trier [of fact] may find this element proven from less obvious evidence, considering the nature and circumstances surrounding the act itself." *Johnson*, 2013 WL 501779, at *11 (collecting cases). "[J]urors may use their common knowledge and experience in making reasonable inferences from evidence" in determining whether a defendant acted for the purpose of sexual arousal or gratification. *State v. Meeks*, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993); *see also Allison*, 618 S.W.3d at 40.

The evidence adduced at trial, when viewed in the light most favorable to the State, showed that on the night of the offenses, the victim awoke repeatedly to find her sweatpants had been pulled progressively further down from her waist. The first time she awoke, the victim found that her legs had been straightened, that her blanket had been pushed onto the floor, and that her pants had been pulled down roughly one to two inches lower than she typically wore them. She also saw the Defendant "standing over [her]." When the victim asked what the Defendant was doing, he asserted that he "heard a noise" near the victim and came over to investigate it. The victim pulled her pants up and went back to sleep. She then awoke a second time and found that her pants had been pulled down again, slightly lower than they had been the first time. Her blanket was on the floor, her legs were straightened, and she was facing the ceiling. The victim again saw the Defendant and asked what he was doing, and the Defendant provided a similar explanation. The victim grew frightened, curled up into a ball, and wrapped her blanket around her. When she awoke

the final time, she found that her pants were pulled down to the point that her underwear was exposed and her legs were straightened. She also found that the Defendant was standing over her, holding both of her ankles in one hand and shining his cell phone's flashlight towards her exposed underwear with his other hand. Upon seeing that the victim was awake, the Defendant ran downstairs.

From this proof, a reasonable juror could have concluded that the Defendant removed the victim's blanket, pulled her sweatpants down to expose her underwear, straightened her legs, held her ankles, and shone his flashlight towards her exposed underwear. The offensive and embarrassing nature of the Defendant's observation of the victim, his removal of her clothing, his use of a flashlight to better view her, his holding her ankles, and the repetitive nature of his conduct constitute sufficient circumstantial evidence from which a reasonable juror could have concluded the Defendant acted for the purpose of sexual arousal or gratification. Therefore, the evidence is also sufficient to sustain the Defendant's convictions of observation without consent.

## B. PROSECUTORIAL MISCONDUCT

The Defendant also contends that the State committed prosecutorial misconduct by discussing punishment with the prospective jurors during *voir dire*. Specifically, he alleges that the prosecutor violated Tennessee Code Annotated section 40-35-201(b)'s prohibition on commenting on possible penalties for charged offenses by stating the Defendant would not "be punished twice." The State responds that this claim is waived for the Defendant's failure to raise it via contemporaneous objection at trial and that the Defendant is not entitled to plain error relief.

As the State notes, the Defendant failed to raise his claim of prosecutorial misconduct via a contemporaneous objection, so the claim is waived. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010) ("A contemporaneous objection provides the trial court with an opportunity to assess the State's [closing] argument and to caution the prosecution and issue a curative instruction to the jury if necessary."). The Defendant concedes that he did not raise a contemporaneous objection during *voir dire* but nevertheless insists he is entitled to plenary review of his claim of prosecutorial misconduct because he raised it in his motion for new trial and the trial court ruled upon it.

The Defendant's argument for plenary review, however, was squarely addressed and rejected by the Tennessee Supreme Court in *State v. Enix*, 653 S.W.3d 692 (Tenn. 2022). In that case, the defendant argued he was entitled to plenary review of his claim of

prosecutorial misconduct during closing arguments because he raised it in his motion for new trial, despite his failure to contemporaneously object at trial. *Id*. at 699-701. The defendant in *Enix* based this argument upon the Tennessee Supreme Court's holding in *State v. Hawkins*, 519 S.W.3d 1 (Tenn. 2017), in which the Court, "without citation to authority or any discussion of intentionally overruling long-standing Tennessee case law," *Enix*, 653 S.W.3d at 700, elected to apply plenary review to the defendant's claims of prosecutorial misconduct during closing arguments, which the defendant presented for the first time in his motion for new trial. *Hawkins*, 519 S.W.3d at 48. The defendant in *Enix* argued that this precedent entitled him to plenary review of his claims, but the Tennessee Supreme Court disagreed and held "that plain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *Enix*, 653 S.W.3d at 700-01. The Tennessee Supreme Court also explicitly overruled *Hawkins* to the extent it was inconsistent with that ruling. *Id*. at 701.

In this case, the Defendant does not argue that *Enix* is, for some reason, inapplicable to his claim of prosecutorial misconduct during *voir dire*, and we do not believe that such an argument would be consistent with the Tennessee Supreme Court's precedent. *See State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) ("[T]he trial court's denial of relief on the [d]efendant's motion for new trial does not serve to alleviate the consequences of the [d]efendant's failure to timely object at trial."). In fact, this court has recently applied *Enix* in the context of addressing a claim of prosecutorial misconduct during *voir dire* which was not first raised via a contemporaneous objection and concluded that the appropriate standard of review was plain error, not plenary review. *See State v. Sliger*, No. E2024-00508-CCA-R3-CD, 2025 WL 1263096, at *8 (Tenn. Crim. App. Apr. 30, 2025), *perm. app. denied* (Tenn. Sept. 10, 2025). Accordingly, the appropriate standard of review for the Defendant's claim of prosecutorial misconduct is plain error.

A defendant may only receive relief under plain error review if he or she proves all five of the following prerequisites:

> (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.

*State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). If a defendant fails to prove any one of the five plain error factors, then they are not entitled to plain error relief, and the appellate court is not required to

analyze the remaining factors. *State v. Bledsoe*, 226 S.W.3d 349, 358 (Tenn. 2007). To qualify as plain error, "[t]he magnitude of the error must have been so significant that it probably changed the outcome of the trial." *Id*. at 354 (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994) (internal quotation marks omitted)); *see also* Tenn. R. App. P. 36(b).

Both the United States Constitution and the Tennessee Constitution protect a criminal defendant's right to trial by an impartial jury. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"); Tenn. Const. art. I, § 9 (providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury of the County in which the crime shall have been committed[.]"). *Voir dire* exists to protect a defendant's right to trial by an impartial jury by ensuring the jurors selected for trial are competent and unbiased. *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993). During *voir dire*, the trial court must "permit counsel to introduce themselves and make brief, non-argumentative remarks that inform the potential jurors of the general nature of the case." Tenn. R. Crim. P. 24(a)(2).

The State may commit prosecutorial misconduct during arguments or *voir dire* by

> (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.

*State v. Jones*, 568 S.W.3d 101, 145 (Tenn. 2019) (citing *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)); *Sliger*, 2025 WL 1263096, at *8. Our analysis of whether a challenged portion of the State's comments constituted prosecutorial misconduct and prejudiced a defendant's trial is guided by the following factors:

> (1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

*State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008); *see also Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). "[P]rosecutorial misconduct does not amount to reversible

- 17 -

error absent a showing that it has affected the outcome of the case to the prejudice of the defendant." *State v. Reid*, 164 S.W.3d 286, 321 (Tenn. 2005) (citing *State v. Chalmers*, 28 S.W.3d 913, 917 (Tenn. 2000)).

The Defendant challenges the following statement made by the prosecutor during *voir dire* while discussing the elements of the Defendant's charges of observation without consent:

> So[,] for this one, the first count of observation without consent, the word that's underlined up here is "offend." The second count is the exact same thing, but with one word different, and that's the word "embarrass," okay. And so[,] we are going to ask you all to find the [D]efendant guilty of both of those offenses.
>
> *He's not going to be punished twice, okay.*[2] But there are two alternative theories that if the jury finds these elements are met, then we're going to ask you to find him guilty.
>
> So[,] we're going to ask you to find him guilty of two offenses that have to do with observation without consent. One "offend" and one "embarrass." *And again, he's not going to be punished twice.* Does everybody understand that?

The Defendant asserts that by informing the prospective jurors that the Defendant would not "be punished twice," the prosecutor violated Tennessee Code Annotated section 40-35-201(b), which provides that "[i]n all contested criminal cases, except for capital crimes . . . the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses." The Defendant likens the prosecutor's statements in this case to those made during closing arguments in *State v. Lockhart*, No. W2018-00051-CCA-R3-CD, 2019 WL 1753056, at *11 (Tenn. Crim. App. Apr. 17, 2019), *perm. app. denied* (Tenn. Aug. 20, 2019). In that case, this court concluded that the prosecutor's discussion of the doctrine of merger with the jury violated Code section 40-35-201(b) because "the merger of offenses also implicates sentencing concerns." *Id*. (citing *State v. Pamblanco*, No. 2015-01870-CCA-R3-CD, 2016 WL 6958888, at *8 (Tenn. Crim. App. Nov. 29, 2016), *perm. app. denied* (Tenn. Apr. 12, 2017)). The State responds that the comments did not go so far as those found improper in *Lockhart* because the prosecutor did not specifically mention merger, double jeopardy, or sentencing options.

---

[2] We have identified the statements the Defendant specifically challenges in italics.

We agree with the Defendant that the prosecutor's informing the jury that the Defendant would not "be punished twice" violated Tennessee Code Annotated section 40-35-201(b). However, we cannot say this error affects any of the Defendant's substantial rights such that he would be entitled to plain error relief in light of the sufficiency of the convicting evidence. The jury was presented with proof that the Defendant awoke the victim three times as he attempted to pull down her sweatpants. The final time the victim awoke, she found the Defendant holding her ankles in one hand to straighten her legs out in front of her and using his other hand to shine a flashlight towards her exposed underwear. The victim fled from the Defendant, began crying in her bedroom, and testified that her "world just broke" afterwards. This evidence was sufficient to sustain the Defendant's convictions of observation without consent, even considering the prosecutor's improper comments. The Defendant is not entitled to plain error relief on this issue.

## C. PRIOR CONSISTENT STATEMENTS

Next, the Defendant challenges the trial court's admission of three prior consistent statements offered to rehabilitate the victim's credibility. The Defendant contends that the victim's credibility was not sufficiently impeached on cross-examination to warrant the introduction of her prior consistent statements. He also asserts that the statements were inadmissible because they were not, in fact, consistent with the victim's direct examination testimony. Finally, he argues the trial court erred by failing to issue a limiting instruction to the jury for each prior consistent statement. The State responds that the trial court's admission of the victim's prior consistent statements was proper and that its limiting instruction was sufficient.

Hearsay statements are those "statement[s], other than one[s] made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible, Tenn. R. Evid. 802, unless they fall into one of the exceptions listed in Tennessee Rules of Evidence 803 and 804. "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the [trial] court must exclude the statement." *State v. Kendrick*, 454 S.W.3d 450, 479 (Tenn. 2015). When considering whether a statement is inadmissible hearsay, the trial court must first determine whether the statement constitutes hearsay; if so, it must then determine whether the statement qualifies as an exception to the rule against hearsay. *Id*.

An appellate court's standard of review of a trial court's ruling on hearsay evidence is layered. *Id*. A trial court's findings of fact and credibility determinations are binding upon the appellate court unless the evidence preponderates against them. *Id*. (citing *State v. Gilley*, 279 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). A trial court's conclusions of law as to whether the challenged statement is hearsay and whether it qualifies as an

exception to the rule against hearsay are reviewed *de novo*. *Kendrick*, 454 S.W.3d at 479 (first citing *State v Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); and then citing *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). However, simply because a statement qualifies as an exception to the rule against hearsay does not mean that the trial court must admit the statement; in other words, the statement may nevertheless violate other rules of evidence. *Kendrick*, 454 S.W.3d at 479 (citing *Gilley*, 297 S.W.3d at 760-61). When the trial court concludes that a statement is inadmissible under another rule of evidence, then the appellate courts review the trial court's decision for abuse of discretion. *State v. Howard*, 504 S.W.3d 260, 276 (Tenn. 2016) (citing *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015)).

Prior consistent statements are hearsay statements "if offered for the truth of the matter asserted therein." *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980). Generally, prior consistent statements are inadmissible for the purpose of rehabilitating a witness's credibility, except under certain exceptions. *Id.* As applicable to this case, prior consistent statements may be admissible to rehabilitate a witness's credibility when that credibility has been "attacked on cross-examination as 'recent fabrication' or 'deliberate falsehood.'" *Herron*, 461 S.W.3d at 905 (citing *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988)). As a prerequisite to admissibility, however, the witness's credibility must have "been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up." *Herron*, 461 S.W.3d at 905 (citing *Benton*, 759 S.W.2d at 433-34). This exception authorizes the admission of a witness's prior consistent statement for the limited purpose of rehabilitating a witness's credibility, but not as substantive evidence. *Herron*, 461 S.W.3d at 905. We afford the trial court "wide latitude" in determining whether a witness's credibility has sufficiently been called into question to justify the introduction of a prior consistent statement to rehabilitate that credibility. *State v. Gossett*, No. W2013-01120-CCA-R3-CD, 2014 WL 6609353, at *6 (Tenn. Crim. App. Nov. 21, 2014) (citing *State v. Neese*, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. Dec. 15, 2006), *perm. app. denied* (Tenn. Apr. 23, 2007)), *no perm. app. filed*.

At trial, the victim testified she and the Defendant had a very close relationship prior to the offenses, that the Defendant was her "favorite person in the world," that the Defendant frequently visited her family's home, and that she often spent the night at his home. She stated that when the offenses occurred, her "world just broke." On cross-examination, the victim reiterated that she had a close relationship with the Defendant and testified that she "didn't really feel anything" about no longer being able to see the Defendant. The Defendant then impeached the victim by introducing a portion of her forensic interview as prior inconsistent statements in which she stated that she only really "ha[d] a relationship with her aunt" and that she felt "great" about the Defendant's not being in her life anymore.

The State then called the victim's mother to testify and asked her what the victim told her about the morning after the offenses. The Defendant objected on hearsay grounds, and the trial court held a bench conference. The State responded to the Defendant's hearsay argument by contending that the victim's credibility had been sufficiently impeached on cross-examination to permit the admission of prior consistent statements to rehabilitate her credibility. Following arguments, the trial court held that the proposed testimony was admissible for "that limited purpose."

Similarly, when the State sought to ask Officer Kanning what the victim told her during their interview, the Defendant objected on hearsay grounds, and the trial court held a bench conference. The State reiterated that the victim "had her credibility attacked and at this point the witnesses are allowed to testify to prior consistent statements." The trial court overruled the Defendant's objection.

Finally, during its direct examination of Ms. Sanders, the forensic interviewer, the State sought to introduce a portion of the victim's forensic interview in which the victim recounted her allegations against the Defendant. The Defendant again raised his "[s]tanding objection" to the introduction of prior consistent statements, which the trial court overruled. After the recordings of the victim's forensic interview were played for the jury, the State requested, during another bench conference, that the trial court issue a limiting instruction to the jury to consider the prior consistent statements for the limited purpose of assessing the victim's credibility rather than for substantive evidence. The trial court did so.

The Defendant argues that the trial court erred by admitting the victim's prior consistent statements because they exceeded the scope of rehabilitation necessitated by the defendant's impeachment of the victim's credibility. He likens this case to *State v. Livingston*, 907 S.W.2d 392 (Tenn. 1995), in which the Tennessee Supreme Court held the admission of a victim's prior consistent statements was improper because her credibility was only "mildly questioned on cross-examination through questions concerning her disagreements with the defendant." *Id*. at 398. The Defendant contends that he, similarly, "only mildly questioned on cross-examination [the victim's] credibility regarding her statements about her feelings about the [Defendant]." This argument is not supported by the record. While to be sure, the Defendant cross-examined the victim regarding her feelings about the Defendant and introduced her prior inconsistent statement regarding their relationship, the Defendant also extensively questioned the victim about the sequence of the events she described, placing particular emphasis on the number of times she had woken up. Initially, the victim denied that she awoke more times than she had described during direct examination, and the Defendant requested a bench conference to discuss the admissibility of her statement to law enforcement that she awoke four times on the basis

- 21 -

that it was a prior inconsistent statement. After that hearing, the Defendant again asked the victim if she awoke an additional time, and the victim conceded that she did. Although the Defendant was unable to introduce extrinsic proof of the victim's prior inconsistent statement, an "impeaching attack on the witness's credibility need not be successful in order to admit the prior consistent statement." *Gossett*, 2014 WL 6609353, at \*6 (citing *Neese*, 2006 WL 3831387, at \*6). Moreover, the implication the Defendant sought to be drawn through his impeachment of the victim's testimony regarding her relationship with the Defendant and her feelings following the offense was that the victim had fabricated her allegations against the Defendant, and the State was permitted to rebut that implication of a deliberate falsehood by rehabilitating the victim's credibility. *Herron*, 461 S.W.3d at 905. Accordingly, the trial court did not abuse its discretion in determining that the victim's credibility was sufficiently called into question to warrant the introduction of her prior consistent statements.

The Defendant also asserts that the prior statements were not, in fact, consistent with the victim's testimony on direct examination. He notes that the victim testified that the final time she awoke, she saw the Defendant shining a flashlight at her exposed underwear; however, she did not mention this fact in any of her statements to the victim's mother, Officer Kanning, or Ms. Sanders. The victim testified that on the night of the offenses, she repeatedly awoke to find that her sweatpants were down lower than they had been when she fell asleep; when she awoke the final time, she found that her sweatpants were down low enough to expose her underwear, that the Defendant was holding her ankles so that her legs were straightened in front of her, and that the Defendant shined a flashlight towards her exposed underwear. Her statements to her mother, Officer Kanning, and Ms. Sanders, though omitting the detail about the Defendant's use of a flashlight, were consistent with that testimony and were thus admissible as prior consistent statements. *See State v. Fitzpatrick*, No. M2012-00186-CCA-R3-CD, 2013 WL 215206, at \*10 (Tenn. Crim. App. May 20, 2013) (concluding that while "the victim's direct examination testimony regarding the date of the crime was inconsistent with her prior statements . . . regarding the date," "the remainder of her prior statements . . . were highly consistent with her trial testimony" and were admissible in light of the defense's cross-examination attacks on the victim's credibility), *perm. app. denied* (Tenn. Nov. 18, 2013). Accordingly, the trial court did not abuse its discretion in concluding that the statements were consistent with the victim's trial testimony.

Finally, the Defendant contends that the trial court erred by failing to instruct the jury to consider each of the victim's prior consistent statements for the limited purpose of evaluating the victim's credibility and not as substantive evidence. While he concedes that the trial court issued such an instruction following the introduction of the victim's prior consistent statement to Ms. Sanders at the State's request, he nevertheless asserts that the

trial court erred by failing to issue limiting instructions for each prior consistent statement sua sponte.

When a prior consistent statement is admitted to rehabilitate a witness's credibility, the trial court should, upon request, issue a limiting instruction to the jury that the prior consistent statement is not to be considered for the truth of the matter asserted therein. Tenn. R. Evid. 105; *Herron*, 461 S.W.3d at 905; *State v. Ward*, No. M2017-02269-CCA-R3-CD, 2019 WL 1436151, at *23 (Tenn. Crim. App. Apr. 1, 2019), *perm. app. denied* (Tenn. July 18, 2019). However, the Defendant failed to request any limiting instruction at trial. As this court has repeatedly held, a defendant who fails to request that the trial court instruct the jury as to the limited admissibility of a prior consistent statement waives appellate review of that issue. *See, e.g.*, *State v. Robinson*, 971 S.W.2d 30, 43 (Tenn. Crim. App. 1997); *State v. Cianfarani*, No. M2022-01200-CCA-R3-CD, 2023 WL 6534236, at *14 (Tenn. Crim. App. Oct. 6, 2023), *perm. app. denied* (Tenn. Mar. 6, 2024); *State v. Sherrod*, No. W2015-02022-CCA-R3-CD, 2017 WL 1907723, *11 (Tenn. Crim. App. May 9, 2017), *perm. app. denied* (Tenn. Sept. 22, 2017).

Regardless, we note that the jury was, in fact, instructed as to the limited admissibility of two of the victim's prior consistent statements. As the Defendant concedes, the trial court issued a contemporaneous limiting instruction following the introduction of the victim's forensic interview as a prior consistent statement. Additionally, during deliberations, the jury returned a question asking where it could find and review Officer Kanning's video-recorded interview with the victim. The trial court responded to this question by instructing the jury that the interview was introduced as a prior consistent statement that "is not admissible as substantive evidenc[e] for the jury to have during deliberations. The purpose of a prior consistent statement is to attempt to rehabilitate the alleged victim's credibility when it has been challenged and should not be considered by the jury for any other purpose." Thus, the jury received limiting instructions for two of the challenged prior consistent statements, and the jury is presumed to follow the trial court's instructions. *State v. Jordan*, 325 S.W.3d 1, 66 (Tenn. 2010) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006)). Although no limiting instruction was provided regarding the presentation of the victim's prior consistent statement through the victim's mother's testimony, the Defendant waived any claim of error on appeal by failing to request it. The Defendant is not entitled to relief on this issue.

D.  RESTRICTION OF CROSS-EXAMINATION

The Defendant also argues the trial court erred by restricting his ability to cross-examine two of the State's witnesses: the victim and the victim's father. At trial, the Defendant sought to question the victim on cross-examination regarding her prior accusations of abuse against someone other than the Defendant, arguing that her responses

would be relevant to show that the victim had fabricated her allegations against the Defendant and to impeach her credibility. He also sought to question the victim's father regarding a recent criminal charge of theft to impeach his credibility. The trial court denied both requests. On appeal, the Defendant contends that the trial court's restriction of his cross-examination of the victim violated his constitutional right to present a defense and Tennessee Rule of Evidence 616. He also argues that the trial court's restriction of his cross-examination of the victim's father violated the Defendant's constitutional right to confront the witnesses against him. The State responds that the trial court properly restricted the scope of the Defendant's cross-examination as to each witness. We will address each issue in turn.

## 1. STANDARD OF REVIEW

Both the United States Constitution and the Tennessee Constitution guarantee a criminal defendant the right to confront the witnesses against him or her at trial. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed… and… to be confronted with the witnesses against him."); Tenn. Const. art. I, § 9 (providing "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face."). These guarantees protect a criminal defendant's right to face the witnesses in court and to cross-examine them. *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000) (first citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); and then citing *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992)).

However, a criminal defendant's right to cross-examine witnesses is not unlimited. *See State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) ("'[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'") (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)). The trial court may impose reasonable restrictions on the scope of cross-examination to limit problems of "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see also State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses." *State v. Hardison*, 680 S.W.3d 282, 315 (Tenn. Crim. App. 2023) (citing *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984)).

## 2. THE VICTIM

The Defendant contends the trial court erred in denying his request to cross-examine the victim regarding her prior accusations of abuse. At trial, the Defendant sought to introduce a portion of the victim's forensic interview in which she discussed having been previously sexually assaulted by someone other than the Defendant and noted that the individual was no longer permitted to see her. The Defendant contends that this evidence was crucial to his defense that the victim fabricated her allegations against the Defendant to prevent him from permanently moving into her home, and that its exclusion prevented him from presenting his defense. He also asserts that he was entitled to present this evidence to impeach the victim's credibility pursuant to Tennessee Rule of Evidence 616. The State responds that the trial court properly restricted cross-examination because the evidence was irrelevant and was not crucial to the Defendant's defense.

The United States Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense through both the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *Crane v. Kentucky*, 476 U.S. 683 (1986) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *Brown*, 29 S.W.3d at 432. This protection includes "[t]he right to offer the testimony of witnesses" and "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). This right, however, is not absolute; the criminal defendant, as well as the State, "must comply with established rules of procedure and evidence," which are designed to "assure fairness and reliability in the criminal trial process." *Flood*, 219 S.W.3d at 316 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (internal quotation marks omitted)). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not relevant is inadmissible, and "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee," the Tennessee Rules of Evidence, or "other rules or laws of general application in the courts of Tennessee." Tenn. R. Evid. 402. Further, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," even if it is otherwise relevant. Tenn. R. Evid. 403.

Generally, a trial court's ruling on the admission of evidence based upon relevance will not be reversed unless the trial court abused its discretion. *See State v. Gomez*, 367

S.W.3d 237, 243 (Tenn. 2012); *State v. DuBose*, 953 S.W.2d 649, 652-53 (Tenn. 1997); *see also State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006). Under that standard of review, we will reverse the trial court's decision "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and the admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (internal quotation marks omitted) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). However, the trial court's erroneous exclusion of evidence may be constitutional error if it "thwarts a criminal defendant's right to present a defense." *State v. Bell*, 512 S.W.3d 167, 190; *Brown*, 29 S.W.3d at 436. In consideration of a defendant's assertion of violation of his or her right to present a defense, we consider "(1) whether the evidence is critical to the defense, (2) whether it bears sufficient indicia of reliability, and (3) whether the interest supporting exclusion is substantially important." *Rimmer*, 623 S.W.3d at 279 (citing *Brown*, 29 S.W.3d at 433-34).

The record indicates that the Defendant filed a pretrial motion to compel the State to disclose any evidence in its possession pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), regarding the victim's prior accusations of sexual assault. The State opposed this motion, and the trial court held a hearing on February 22, 2022. At the hearing, the Defendant contended that the victim had previously reported suffering two prior instances of abuse and that one instance occurred in Kentucky. The Defendant requested that the trial court compel the State to procure any materials documenting the victim's allegations. The State responded that it had filed a motion in opposition to the Defendant's request in which it argued such evidence would be inadmissible pursuant to Tennessee Rule of Evidence 412 and Tennessee Code Annotated section 24-7-125.

The State conceded that after the victim reported the offenses in this case, a DCS employee interviewed the victim and her family and included in a subsequent report that the victim's parents "sa[id] a sentence or two about this incident that happened in Kentucky." The Defendant also noted that the victim described having been previously assaulted during her forensic interview. The Defendant argued that any additional documentation of the victim's prior accusations could be relevant to the jury's determination of "the credibility and motivation of the people in this case."

Following arguments, the trial court denied the Defendant's *Brady* motion, concluding it was unable to compel the Commonwealth of Kentucky to disclose any additional documentation of its reports of the victim's prior allegations. However, the trial court held the State's motion to exclude any proof of the victim's prior allegations under Tennessee Rule of Evidence 412 and Tennessee Code Annotated section 24-7-125 in abeyance "until we know more about this situation."

At trial, the Defendant asked the victim during cross-examination, "Before these incidents back in April 2021, had someone else ever hurt you?" The State objected, arguing the Defendant's proposed line of questioning regarding previous abuse was inadmissible under Tennessee Rules of Evidence 404(b) and 412. The Defendant responded that the proposed testimony was admissible "under several different avenues," including as proof of the victim's "state of mind, knowledge of sexual acts, [and] motive." The Defendant argued that Tennessee Rule of Evidence 412 did not exclude the proposed testimony because that rule specifically lists the sexual offenses to which it applies and does not include observation without consent. The following exchange then occurred:

THE COURT: Okay. What's the proffer of what – if the victim did answer in the affirmative, what is the proffer?

THE DEFENDANT: Judge, it was literally going to be two questions: Has anyone ever – essentially, have you ever been sexually assaulted before? Yes. And were you able – as a result, those people weren't allowed to see you anymore? Yes. . . . I was not planning on going into the details. If she said no, then we would have an impeachment issue because she discusses that it happened during her interviews. But if she had answered in the affirmative, it would have been two questions.

The Defendant further argued that the line of questioning would have been admissible to impeach the victim pursuant to Tennessee Rule of Evidence 616. The State responded that the Defendant's proposed questions were irrelevant and "violate[d] the purpose of Rule 412."

Following arguments, the trial court denied the Defendant's request to cross-examine the victim regarding her prior accusations:

The [c]ourt has considered the request from both parties. What we have outstanding to deal with is the defense is attempting to get in prior allegations that the victim had made about sexual abuse from an episode that was separate and apart from the case that is now on trial.

The [c]ourt has considered that and really what the [c]ourt does find is that although [Rule] 412 does not contemplate this particular offense of observation without consent, I think the State does bring a good point that it's – what you're supposed to do is bring this up before trial, particularly if Judge Hixson had ruled on this.

- 27 -

To be surprised in court and to be asked that question was certainly alarming to the [c]ourt. So under [R]ule 401, I'm not even going to look at analysis under [Rule] 412. Under Rule 401[,] first we need to determine whether or not it's relevant.

The [c]ourt cannot determine that any sort of sexual allegations that the victim has made in the past are not [sic] relevant to this proceeding. Even if they were, pursuant to Rule 403, they would be excluded because the probative value would be significantly, substantially outweighed by the danger of unfair prejudice to the victim in this case.

So with respect to that line of questioning, the [c]ourt's ordering that that is not to be asked of the victim and that is not to come in in this trial.

Although the Defendant argues on appeal that the trial court's restriction of his cross-examination of the victim denied him a fair trial by preventing him a meaningful opportunity to present a complete defense, he made no constitutional claim at trial or in his motion for new trial; instead, he argued for the evidence's admissibility pursuant to the Tennessee Rules of Evidence. Consequently, the Defendant's constitutional claim of error is waived. *See* Tenn. R. App. P. 3(e) (Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial[.]"); *State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017) ("Generally, issues raised for the first time on appeal are waived."); *see also State v. Robinson*, No. M2019-00303-CCA-R3-CD, 2020 WL 1923152, at *45 (Tenn. Crim. App. Apr. 21, 2020) (holding that the defendant's challenge to the trial court's exclusion of evidence based on his "due process right to present a defense" was not waived because the defendant "did not make a constitutional claim" in the trial court), *perm. app. denied* (Tenn. Aug. 7, 2020). Moreover, it is well settled that "'a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason' on appeal." *State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023) (quoting *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1998)).

Accordingly, we will address the victim's argument that he should have been permitted to present proof of the victim's prior accusations of abuse pursuant to Tennessee Rule of Evidence 616 because it was relevant to show her motive and bias against the Defendant. Tennessee Rule of Evidence 616 provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."

- 28 -

The Defendant's theory of the case was that the victim was an untrustworthy witness. He extensively cross-examined her and impeached her credibility on several grounds, including her relationship with the Defendant. He also sought to argue that the victim did not want the Defendant to move into her home. As part of this argument, he sought to ask the victim whether she had previously been sexually abused and, if so, whether the perpetrator of that abuse was permitted to see her. Knowing the victim had previously said as much during her forensic interview, the Defendant intended to present a theory to the jury that the victim, knowing from a previous experience that accusing someone of improper behavior resulted in their no longer being permitted to be near the victim, fabricated her allegations against the Defendant to ensure he was not permitted to move into her home. In other words, the Defendant contended at trial, and reiterates on appeal, that the proposed testimony would have been relevant to prove the victim's motive to lie and, by extension, as an additional means of attacking her credibility, pursuant to Tennessee Rule of Evidence 616.

We disagree. Although evidence may, arguably, be helpful to impeach a witness, it must nevertheless still be admissible. *See Gomez*, 367 S.W.3d at 248 ("A party may not introduce a subject that is inadmissible to attack the credibility of a witness."); *Hatchett v. State*, 552 S.W.2d 414, 415 (Tenn. 1977) ("The State cannot ask a witness an irrelevant but prejudicial question, and then, under the theory of impeachment, predicate a second irrelevant and prejudicial question upon the defendant's response to the first question."). The proposed line of questioning, however, was irrelevant. The simple fact that the victim had been previously sexually abused and that the perpetrator was no longer permitted to see the victim had no bearing, in and of itself, on whether the victim fabricated the facts of her abuse in this case. *See State v. Williams*, No. W2015-01981-CCA-R3-CD, 2016 WL 4577064, at *5 (Tenn. Crim. App. Aug. 31, 2016) (holding that evidence which is irrelevant, including on the issue of a witness's credibility, is inadmissible), *no perm. app. filed*. The victim's proposed testimony did not make her more or less likely to lie about the Defendant's assaulting her or observing her without her consent, nor did it in any way impact her credibility as a witness in this case. Whether the victim wanted the Defendant removed from the house prior to the allegations may have been a relevant question. Whether the victim had been sexually abused in the past was not. The trial court did not abuse its discretion in concluding that the proposed line of questioning was irrelevant.

We note that the Defendant also contends the trial court erred by considering Tennessee Rule of Evidence 412 and Tennessee Code Annotated section 24-7-125 in its restriction of his cross-examination of the victim. This argument is unavailing. Although the State argued the proposed testimony was inadmissible under those provisions and the trial court referenced them at trial and at the hearing on the Defendant's motion for new trial, the trial court's ultimate ruling regarding the Defendant's cross-examination of the victim regarding her prior accusations of abuse was based upon Tennessee Rule of

Evidence 401. The trial court also noted that those issues were not timely raised pretrial. Accordingly, the trial court did not abuse its discretion in declining to consider the evidence's admissibility pursuant to Tennessee Rule of Evidence 412 or Code section 24-7-125. The Defendant is not entitled to relief on this issue.

### 3. THE VICTIM'S FATHER

The Defendant also argues the trial court erred by restricting his cross-examination of the victim's father regarding a recent criminal charge of theft. He argues that he was entitled to inquire into the victim's father's recent charge to impeach his credibility, pursuant to Tennessee Rule of Evidence 608(b), and that the trial court's prevention of his doing so violated the Confrontation Clause and his right to due process of the law. The State responds that the trial court did not err in restricting cross-examination, but if it did, then the error was harmless because the Defendant was nevertheless sufficiently permitted to impeach the victim's father's credibility.

Tennessee Rule of Evidence 608(b) authorizes impeachment of a witness's credibility by inquiring into a witness's character for truthfulness based upon specific instances of conduct when certain conditions are met. As relevant to this case, the trial court "upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b). However, both the United States Constitution and the Tennessee Constitution protect a criminal defendant's right against self-incrimination. U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."); Tenn. Const. art. I, § 9 ("In all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.")

Fifth Amendment concerns may be implicated where, as here, the witness testifies he or she has pending charges for a crime of dishonesty. Although Tennessee Rule of Evidence 608(b) permits cross-examination of a witness by inquiring into specific instances of conduct "if probative of truthfulness or untruthfulness," if "there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, . . . the right against self-incrimination is the stronger and paramount right." *State v. Dicks*, 615 S.W.2d 126, 129 (Tenn. 1981) (citing *Frazier v. State*, 566 S.W.2d 545, 551 (Tenn. Crim. App. 1978)). Accordingly, a trial court may restrict cross-examination pursuant to Tennessee Rule of Evidence 608(b) where it is apparent that "the answers to certain questions will result in the witness asserting the Fifth Amendment privilege against self-incrimination." *State v. Dunn*, No. E2021-00343-CCA-R3-CD, 2022 WL 2433687, at *13 (Tenn. Crim. App. July 2, 2022) (citing *State v. Lakins*, No. 03C01-9703-CR-00085, 1998 WL 128842, at *4 (Tenn. Crim. App. Mar. 24, 1998), *perm. app. denied* (Tenn. Nov. 2, 1998)), *perm. app. denied* (Tenn. Dec. 14, 2022).

After *voir dire*, but before opening statements, the Defendant notified the trial court that the victim's father had been arrested the day before for a charge of theft in McMinn County. The State acknowledged this and requested the trial court hold a hearing pursuant to Tennessee Rule of Evidence 404(b) to determine the admissibility of any proof of the victim's father's recent charges. The trial court stated it would do so before the victim's father testified. In a bench conference following the victim's testimony, the trial court also noted that it would address the issue pursuant to Tennessee Rule of Evidence 608.

At the subsequent jury-out hearing, the trial court questioned the victim's father regarding his recent criminal charge:

> Q: All right, sir, it's the [c]ourt's understanding that you may be called as a State's witness in this case. It's further the [c]ourt's understanding that you've recently been charged, I believe in the general sessions court with the offense of theft –
>
> A: Uh-huh.
>
> Q: – is that correct? All right. What I need to advise you is that you have a right to not subject yourself to self-incrimination. Do you understand that, sir?
>
> A: (Witness nods head.)
>
> Q: And if you testify with regard to a crime of dishonesty, sometimes that can become relevant. And when it does, the lawyers can ask you about that. And if you do that, that may be a concession to guilt on the matter that could be used against you further down the road. [] So my duty is to advise you that you have a Fifth Amendment right and protection against self-incrimination. Do you understand that, sir?
>
> A: I do.
>
> Q: All right. Do you intend to testify in this case?
>
> A: In this case?
>
> Q: Yes, sir.
>
> A: I do in this case, yes, sir.

- 31 -

Q: And with respect to if you're asked about a pending charge that you have, if it your – what do you plan to do?

A: I plead the Fifth on that.

Q: Okay. All right, that's sufficient. Does either party have further questions for [the victim's father]?

Following this testimony, defense counsel also informed the trial court that she believed the victim's father had also been charged with burglary in 2018. Defense counsel conceded she was unsure if the victim's father was convicted of that charge but noted that the charge was "listed on the Tennessee court's website." The trial court held that defense counsel had failed to introduce "clear and convincing evidence of any disposition in that case." Defense counsel then asked the trial court whether she would be permitted to ask the victim's father if he had been charged. The trial court held that if the victim's father "intend[ed] to testify about other matters, he would be permitted to do that, but with respect to the present charge, the defense counsel would not be able to ask him about that in any, in any capacity," reasoning that the victim's father's right against self-incrimination outweighed the Defendant's right to cross-examine the victim's father regarding his pending charge.

The Defendant contends that the trial court abused its discretion in restricting him from asking the victim's father if he had been charged with a crime of dishonesty, because such testimony is relevant and non-incriminatory evidence that the Defendant could have used to impeach the victim's father's credibility. We disagree. In this case, the sole question the Defendant posed to ask the victim's father was whether he had recently been charged with theft. The fact that a witness has been charged with a criminal offense, even one involving dishonesty, is not in itself relevant evidence to impeach the witness's credibility. The witness, like all criminal defendants, is presumed innocent of the charge against them. Prior to conviction, only the specific act of dishonesty by the witness would be relevant under Tennessee Rule of Evidence 608(b) to attack credibility. The act of charging the witness with a crime was an act by the State, not the witness. Since the Defendant only wanted to ask the victim's father if he had been charged with theft, he, in essence, wanted to impeach the witness with the conduct of another, namely the conduct of the State of Tennessee. Thus, the trial court did not abuse its discretion in prohibiting this question, as it was not relevant to the witness's credibility.

Concerning the specific instance of conduct by the victim's father that may have led to the theft charge, upon examination, the victim's father agreed that he had been charged but that he intended to invoke his Fifth Amendment privilege against self-incrimination if

asked about that charge.[3]  Despite this answer, the Defendant maintains on appeal that he should have been permitted to pose this question to the victim's father to impeach his credibility.  This is, effectively, an argument that the trial court should have compelled the victim's father to invoke his Fifth Amendment privilege before the jury so the Defendant could test his credibility.  However, our case law is clear that "[n]either side has a right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him."  *Dicks*, 615 S.W.2d at 129; *see also State v. Rollins*, 188 S.W.3d 553, 569 (Tenn. 2006) (noting that a witness's invocation of his or her Fifth Amendment privilege in the presence of the jury may have "a disproportionate impact on [the jury's] deliberations") (quoting *State v. Bowles*, 439 F.2d 536, 541-42 (D.C. Cir. 1970)).  Of course, as the Defendant correctly notes, where a party seeks to cross-examine a witness pursuant to Tennessee Rule of Evidence 608(b) and the witness can testify regarding other relevant, non-incriminatory facts, the trial court does not err by permitting examination regarding those facts, so long as they do not infringe upon the witness's invocation of his or her privilege against self-incrimination.  *See, e.g., State v. Hardison*, 680 S.W.3d 282, 316 (Tenn. Crim. App. 2023); *State v. Dooley*, 29 S.W.3d 542, 551 (Tenn. Crim. App. 2000); *Lakins*, 1998 WL 128842, at *4.  But where, as here, a party seeks to ask a witness a single question regarding a prior instance of conduct and it is evident that the witness intends to invoke his or her privilege against self-incrimination in response to that question, a trial court does not abuse its discretion by restricting cross-examination.  *Dunn*, 2022 WL 25433687, at *13.

Nevertheless, the Defendant likens this case to *State v. Hardison*, in which this court ruled that a trial court did not err by permitting inquiry into certain non-incriminatory aspects of a witness's pending charges on cross-examination.  However, there are several important differences between *Hardison* and this case, primarily that the defendant explicitly sought the trial court's approval to inquire into non-incriminatory facts that were highly relevant to his theory of the case.  In *Hardison*, the defendant sought to cross-examine the witness regarding his pending charges, which included "drug possession charges," because "it goes to whether [the witness] was on meth" on the day he purported to see the defendant with a firearm prior to the victim's murder, as well as issues of potential bias or an expectation of favoritism in return for his testifying for the State.  *Hardison*, 680 S.W.3d at 293-94.  At trial, the witness invoked his Fifth Amendment

---

[3] We note that the Defendant does not argue on appeal that the trial court failed to comply with Tennessee Rule of Evidence 608(b)'s procedural requirements; although he argues he should have been able to test the victim's father's credibility pursuant to Tennessee Rule of Evidence 608(b), his challenge is primarily based upon whether the trial court erred by permitting the victim's father to invoke his Fifth Amendment privilege against self-incrimination.  Nevertheless, we are constrained to note that beyond the victim's father's agreement that he had recently been charged with theft in the general sessions court, there was remarkably little proof before the trial court upon which it could have concluded that a reasonable factual basis existed for the inquiry.  *See* Tenn. R. Evid. 608(b).

privilege through counsel regarding the details of his pending charges, and the trial court restricted cross-examination in that regard but otherwise permitted the defendant to ask the witness "what he's got pending on the table . . .; the fact that he[] hasn't been prosecuted yet, he's not been held to account, [and] the State's not pushed [his] cases to trial." *Id.* at 294, 298 (alterations in original). A central issue in *Hardison* was the sufficiency of the State's proof of the defendant's identity as the shooter, and the areas in which the trial court authorized cross-examination permitted the defendant to test the credibility of a witness's testimony, which tended to identify the defendant as the shooter. *Id.* at 298, 318-20.

Even setting aside the fact of the victim's father's invocation of his Fifth Amendment privilege against self-incrimination and the lack of relevance, the Defendant's proposed cross-examination regarding his pending charge lent little probative value to his defense, in contrast to the cross-examination permitted in *Hardison*. Although the Defendant correctly notes that credibility was a central issue in this case, it was the victim's credibility, not her father's, upon which the State relied. The victim's father's testimony added little, if any, incriminating evidence against the Defendant. What is more, despite his argument that the trial court's restriction of his cross-examination of the victim's father violated the Confrontation Clause and his right to due process of the law, the Defendant was freely permitted to impeach the victim's father's credibility in other manners. During his cross-examination of the victim's father, the Defendant noted that the victim's father had testified on direct examination that he was unable to recall whether he provided any details of the victim's allegations to the Defendant on their ride back home but on cross-examination agreed that he told the police that the Defendant "denied it all" and that he recalled "the conversation" he and the Defendant had. The Defendant reiterated this attack on the victim's father's credibility during his closing argument by noting that "originally, he testified he couldn't remember the details of what he and [the Defendant] talked about on the car ride home. Later[,] he was sure of it." Accordingly, in light of the sufficiency of the convicting evidence, the limited value of the victim's father's testimony to that evidence, and the Defendant's impeachment of the victim's father's credibility via other avenues, we cannot say that the trial court's restriction of cross-examination contributed beyond a reasonable doubt to the jury's verdict of guilty. The Defendant is not entitled to relief.

### E. CUMULATIVE ERROR

The Defendant also argues that the cumulative effect of the errors in this case entitles him to a new trial. "The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial." *Herron*, 461 S.W.3d at 909 (citing *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010)). The cumulative error doctrine provides relief where there are multiple errors committed during the trial, "each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on

the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *Hester*, 324 S.W.3d at 76. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Id*. at 77. Because we discern no properly presented trial court errors in this case, the Defendant is not entitled to relief under the cumulative error doctrine.

## F. MERGER OF OFFENSES

Finally, although not raised by either party, we consider the doctrine of merger as a matter of plain error. Generally, this court's jurisdiction extends only to those issues properly preserved and presented for appellate review. Tenn. R. App. P. 13(b); *State v. Bristol*, 654 S.W.3d 917, 923 (Tenn. 2022). However, this court may also "consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." Tenn. R. App. 13(b); *see also* Tenn. R. App. 36(a) (providing that the appellate courts "shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires"). The standard of review for unpresented or unpreserved issues considered under this discretion is for plain error. Tenn. R. App. P. 36(b); *Hester*, 324 S.W.3d at 56.

Both the United States Constitution and the Tennessee Constitution protect a criminal defendant's right against double jeopardy. U.S. Const. amend. V (providing that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb"); Tenn. Const. art. I, § 10 (providing "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb."). The doctrine of merger provides that "under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015). Merger is required in cases where, as here, "a jury returns guilty verdicts on two counts that represent alternative theories of the same offense." *Id*. (first citing *State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998); and then citing *State v. Cooper*, 336 S.W.3d 522, 523-24 (Tenn. 2011)).

The requirements for plain error review are met in this case. *Rimmer*, 623 S.W.3d at 255-56. The issue was addressed during the appellate arguments, and the parties agreed that merger is required. The record clearly establishes what occurred in the trial court; the Defendant was indicted, tried, and convicted of two charges of observation without consent based upon alternative theories: in count one, that his observation of the victim was offensive, and in count two, that the same observation was embarrassing. These charges arose from the same criminal episode and required merger, *Berry*, 503 S.W.3d at 362, but the trial court did not merge the offenses following the jury's guilty verdict. Moreover, we can perceive no reason for the Defendant to have tactically waived this issue. Accordingly, we remand this case to the trial court for the entry of corrected judgments reflecting the

merger of the Defendant's convictions of observation without consent into a single conviction.

## III. CONCLUSION

Following our review of the record and based upon the foregoing analysis, we remand this case for the entry of corrected judgments reflecting the merger of the Defendant's convictions of observation without consent into a single conviction. We otherwise affirm the judgments of the trial court.

s/ *Steven W. Sword*

STEVEN W. SWORD, JUDGE